On Riverside 22 Investments, LLC’s Motions for Rehearing

ROTHENBERG, J.
The City of Miami (“the City”) and Riverside 22 Investments, LLC (“Riverside”) filed Motions for Rehearing and Rehearing En Banc. The City subsequently withdrew its motions. Riverside’s Motion for Rehearing is denied. We, however, withdraw this Court’s opinion issued on August 29, 2007, and issue the following opinion in its stead to address the dissenting opinion to the denial of the Motion for Rehearing En Banc.
Riverside owns a 4.3-acre parcel located on the south side of the Miami River at 2215 N.W. 14th Street, Miami, Florida. Riverside applied for and obtained from the City a small scale amendment to the Future Land Use Map (“FLUM Amendment”) of the Miami Comprehensive Neighborhood Plan (“Comprehensive Plan”), changing the land use designation of the property from Industrial to Restricted Commercial. Riverside also applied for and obtained a zoning change from SD-4.2 Waterfront Industrial to C-l Restricted Commercial, and a Major Use Special Permit (“MUSP”), thereby allowing Riverside to construct a multi-family development project with a maximum density of 150 units per acre on the property. The ordinance approving the FLUM Amendment was adopted by the City Commission on January 26, 2006, and was signed by the Mayor on January 31, 2006.[1] The City approved the rezoning of the property and the MUSP on the same day. The approved development on this 4.3-acre waterfront parcel is for two twelve-story residential condominiums consisting of 633 dwelling units.
The following parties filed a petition with the Division of Administrative Hearing (“DOAH”), challenging the ordinance that approved the FLUM Amendment: Captain Herbert Payne (“Payne”), a boat captain who owns and operates one of the largest tugboat companies on the Miami River and who relies exclusively on commercial marine business on the Miami River for his livelihood; The Durham Park Neighborhood Association, Inc. (“Durham Park”), a non-profit neighborhood association composed of approximately ninety homeowners and businesses located in the Durham Park area, which is located on the south side of the Miami River and to the east of the Riverside property; and The Miami River Marine Group, Inc. (“Marine Group”), a trade association representing marine and industrial businesses along the Miami River (collectively, “the appellants”). After a hearing, the administrative law judge (“ALJ”) issued a Recommended Order, which was subsequently adopted by the State of Florida Depart *262 ment of Community Affairs (“the Department”), and to which the appellants now appeal.
Because the appellants are challenging agency action, our review is governed by section 120.68, Florida Statutes (2006), and Coastal Development of North Florida, Inc. v. City of Jacksonville Beach, 788 So.2d 204 (Fla.2001). The relevant provisions of section 120.68 provide:
(7) The court shall remand a case to the agency for further proceedings consistent with the court’s decision or set aside agency action, as appropriate, when it finds that:
(a) There has been no hearing prior to agency action and the reviewing court finds that the validity of the action depends upon disputed facts;
(b) The agency’s action depends on any finding of fact that is not supported by competent, substantial evidence ...;
(c) The fairness of the proceedings or the correctness of the action may have been impaired by a material error in procedure or a failure to follow prescribed procedure;
(d) The agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action; or
(e) The agency’s exercise of discretion was:
1. Outside the range of discretion delegated to the agency by law;
2. Inconsistent with agency rule;
3. Inconsistent with officially stated agency policy or a prior agency practice, if deviation there from is not explained by the agency; or
4.Otherwise in violation of a constitutional or statutory provision!.]
(Emphasis added).
Amendments to a local government’s comprehensive plan are legislative in nature and, therefore, are subject to the fairly debatable standard of review. Martin County v. Yusem, 690 So.2d 1288, 1295 (Fla.1997). Thus, where reasonable persons could differ as to the propriety of the planning action, it should be affirmed. Id.; see also Coastal Dev., 788 So.2d at 206 (applying the fairly debatable standard of review to small scale development amendments). However, because the future land use map of a comprehensive plan represents a local government’s fundamental policy decisions, any proposed change to that established policy is a policy decision that requires that those policies be reexamined. Coastal Dev., 788 So.2d at 209.
It seems to us that all comprehensive plan amendment requests necessarily involve the formulation of policy, rather than its mere application. Regardless of the scale of the proposed development, a comprehensive plan amendment request will require that the governmental entity determine whether it is socially desirable to reformulate the policies previously formulated for the orderly future growth of the community. This will, in turn, require that it consider the likely impact that the proposed amendment would have on traffic, utilities, other services, and future capital expenditures, among other things.
Id. at 209 (citing with approval City of Jacksonville Beach v. Coastal Dev. of N. Fla., Inc., 730 So.2d 792, 794 (Fla. 1st DCA 1999) (emphasis added)).
In applying these standards, the City Commission recognized: the conflict in land use this Amendment would create (with Detroit Diesel to the west of the *263 Riverside property and Antillean Marine, a shipping company on the other side of the Miami River); the problems with “sandwiching]” a residential complex between two industrial complexes with Industrial land use designations; the “battles” that will result and the “nightmare” it will create over these “incompatible uses;” and the need for long-term planning on the Miami River. Nevertheless, the City Commission approved this FLUM Amendment without addressing the fundamental policy considerations and ramifications of its decision, leaving consideration of these issues for another day.
After performing a careful and thorough review of the record, we conclude that because the ALJ: (1) failed to examine the FLUM Amendment’s impact upon, and consistency with, fundamental policy decisions contained in both the Comprehensive Plan and the Miami River Master Plan; and (2) made material findings that are unsupported by competent, substantial evidence, we must reverse. We additionally conclude that had the ALJ considered the relevant portions of the Comprehensive Plan and the Miami River Plan and have only relied on the evidence that was supported by competent, substantial evidence, it would have compelled a finding that the Riverside FLUM Amendment is inconsistent with both the Comprehensive Plan and the Miami River Master Plan.
STATUTORY REQUIREMENTS
Section 163.3161, Florida Statutes (2005), which is referred to as the Local Government Comprehensive Planning and Land Development Regulation Act, was enacted to strengthen local governments’ role in the establishment and implementation of comprehensive planning to control future development. Section 163.3161 provides, in part:
(5) It is the intent of this act that adopted comprehensive plans shall have the legal status set out in this act and that no public or private development shall be permitted except in conformity with comprehensive plans, or elements or portions thereof, prepared and adopted in conformity with this act.
[[Image here]]
(7) The provisions of this act in their interpretation and application are declared to be the minimum requirements necessary to accomplish the stated intent, purposes, and objectives of this act; to protect human, environmental, social, and economic resources; and to maintain, through orderly growth and development, the character and stability of present and future land use and development in this state.
(Emphasis added).
Section 163.3177(2) provides in pertinent part that “[t]he several elements of the comprehensive plan shall be consistent, and the comprehensive plan shall be financially feasible....” Additionally, section 163.3177(6) provides that the comprehensive plan shall include certain elements including:
(a) A future land use plan element designating proposed future general distribution, location, and extent of the uses of land for residential uses, commercial uses, industry, agriculture, recreation, conservation, education, public buildings and grounds, other public facilities, and other categories of the public and private uses of land.... For coastal counties, the future land use element must include, without limitation, regulatory incentives and criteria that encourage the preservation of recreational and commercial working waterfronts as defined in s. 342.07....
*264 Amendments to the comprehensive plan may not be made more than two times during any calendar year except: (a) in the case of an emergency, (b) when the amendment is directly related to a proposed development of regional impact, or (c) if the amendment is for a small scale development. § 163.3187(l)(a)-(c), Fla. Stat. (2005). The Riverside FLUM Amendment was sought and was granted as a small scale development pursuant to section 163.3187, Fla. Stat. (2005).[2]
In addition to the statutes regulating land use requiring the enactment of comprehensive planning to control future development and providing a regulatory scheme for amendments to comprehensive plans, is the City’s Zoning Code. Article 6 of the City of Miami Zoning Code (2004) (“City’s Zoning Code”) provides for the creation of SD Special Districts to protect certain areas or districts within the City. Article 6, Section 600, provides in pertinent part as follows:
Section 600. Intent.
It is the intent of these regulations to permit creation of SD Special Districts:
(a) In general areas officially designated as having special and substantial public interest in protection of existing or proposed character, or of principal views of, from, or through the areas;
[[Image here]]
It is further intended that such districts and the regulations adopted for them shall be in accord with, and promote the policies set out in, the Miami Comprehensive Neighborhood Plan and other officially adopted plans in accordance therewith.
City of Miami Zoning Code, Art. 6, § 600 (emphasis added). “The regulations shall be designed to promote the special purposes of the district, as set out in the statement of intent.” Id. at § 600.4.3. Article 6, section 604 of the City’s Zoning Code specifically provides for the creation of a waterfront industrial district to regulate the waterfront property along the Miami River, and states in pertinent part as follows:
Sec. 604. SD-4 Waterfront Industrial District.
Sec. 604.1. Intent.
This district designation is intended for application in areas appropriately located for marine activities, including industrial operations and major movements of passengers and commodities. In view of the importance of such activities to local economy and the limited area suitable and available for such activities, it is intended to limit principal and accessory uses to those reasonably requiring location within such districts, and not to permit residential, general commercial, service, office or manufacturing uses not primarily related to waterfront activities except for office uses in existing office structures. For the purposes of section 3(mm) of the City of Miami Charter, this district shall be construed as an industrial district.
Sec. 604.4. Principal uses and structures.

604..4-.1. Permitted principal uses and structures.

*265 1. Piers, wharves, docks, and railroad service to related loading, storage or distribution facilities.
2. Freight terminals; facilities for warehousing and storage, packing, packaging and crating of materials from or for marine shipment; assembly and distribution facilities for marine shipments, except as provided under permitted uses and structures in section 604.4.2 below.
3. Passenger terminals, including related facilities for handling baggage or freight ground transportation, parking, and establishments to serve needs of passengers and visitors including retail shops, eating and drinking establishments, ticket agencies, currency exchanges and the like.
4. Facilities for construction, maintenance, service, repair, supply or storage of vessels, including shipyards, dry docks, marine railways, shops for marine woodworking, electrical, communication and instrument installation and repair, welding, sail making, engine and motor repair and maintenance; ship chandlers; fuel supply establishments. Manufacture, maintenance, service, repair and/or sales of supply of parts, accessories and equipment for marine needs.
5. Bases for marine dredging, salvage, towing; marine construction offices and yards, piloting headquarters.
6. Sales, charter or rental of vessels, marine supplies and equipment, marine sporting goods and supplies.
7. Establishments for collection, processing and/or distribution or sales of marine food products and byproducts, including eating and drinking establishments related to such operations.
8. Hiring halls for seamen and dock workers.
9. Telecommunication transmission and relay stations; radar installation.
10. Structures and uses other than as listed above for performance of governmental functions (including private facilities supplementing or substituting for governmental functions such as fire protection or provision of security), or relating to operation of public utilities.
11. Commercial marinas, including permanent occupancy of private pleasure craft as living quarters and for temporary occupancy for transients (maximum stay: thirty (30) days) as shall be required for work or security purposes, or for repair work within the district.
12. Cellular communications site provided that where a transmission tower is used the transmission tower shall be by Special Exception only. The transmission tower and anchoring devices, if directly-abutting a residential district, must: (1) be located in the interior side or rear yard of the property; (2) meet minimum setback requirements; (3) be securely anchored, installed and maintained in accordance with all applicable codes; (4) not exceed a maximum height of one hundred and fifty (150) feet; and (5) be separated from adjacent properties by a landscape buffer.
Despite section 163.3161(5), which prohibits development unless it is in conformity with the City’s Comprehensive Plan; section 163.3161(7), which specifies that the purpose of the Act is to protect certain resources and to maintain the character and stability of development in this state through orderly growth and development; section 163.3187, which limits amendments to the Comprehensive Plan; and Article 6 of the City’s Zoning Code, designating key areas on the Miami River as protected *266 property within a protected district due to its importance to the City’s economy, a designation that specifically prohibits residential use or other uses not primarily related to waterfront activities, the City granted Riverside a small scale FLUM Amendment for its property located within this specially protected district, thereby allowing the construction of residential units that are totally unrelated to waterfront activities. As will be addressed in depth herein, Riverside’s FLUM Amendment is contrary to these provisions and inconsistent with the Miami Comprehensive Neighborhood Plan and the Miami River Master Plan.
THE MIAMI COMPREHENSIVE NEIGHBORHOOD PLAN (“Comprehensive Plan”)
The ALJ found that the FLUM Amendment was consistent with the goals, objectives, and policies of the Comprehensive Plan. The ALJ’s evaluation of the evidence was, however, flawed because he failed to consider critical goals, objectives, and policies found in the “Port of Miami River,” “Coastal Management,” and “Future Land Use” sections of the Comprehensive Plan in reaching this conclusion. We will address each of these sections of the Comprehensive Plan separately.
A. The Port of Miami River Subelement
The Comprehensive Plan was adopted by the City Commission in 1989 and amended through August of 2004. Within the Comprehensive Plan is a section devoted to “Ports, Aviation and Related Facilities,” specifying the City’s goals, objectives, and policies regarding development within these critical areas. Within this section there is a subelement titled the “Port of Miami River.” The appellants claim that the Riverside Amendment is inconsistent with this subelement.
Unfortunately, the definition of the “Port of Miami River” has occupied a prominent position of contention among the parties in their pleadings and arguments before the ALJ and this Court, despite our ruling in Payne v. City of Miami, 927 So.2d 904 (Fla. 3d DCA 2005) (“Payne II”). Because the parties continue to dispute the definition of the “Port of Miami River” and its relevance to the Riverside’ FLUM Amendment, we address it here briefly.
Riverside argues that the Port of Miami River subelement only relates to the fourteen commercial shipping companies that were located along the Miami River in 1989. This argument is premised on a footnote found in the Port of Miami River subelement of the Comprehensive Plan which states:
The “Port of Miami River” is simply a legal name used to identify some 14 independent, privately-owned small shipping companies located along the Miami River, and is not a “Port Facility” within the usual meaning of the term. The identification of these shipping concerns as the “Port of Miami River” was made in 1986 for the sole purpose of satisfying a U.S. Coast Guard regulation governing bilge pump outs.
This argument, however, is illogical; it was rejected by this Court in Payne IP, and rejected again by this Court in Payne v. City of Miami, 52 So.2d 707 (Fla. 3d DCA 2010) (“Payne III” or the “the Balbino FLUM Amendment”). In Payne II we stated the following:
We find that the “Port of Miami River” subsection is not limited to 14 unidentified companies. Rather, the footnote explains that the “Port of Miami River” is not a port in the traditional sense of the word. Accordingly, appellants did not have to allege that they *267 were one of the 14 shipping companies referenced in the footnote.
Payne, 927 So.2d at 908 (footnote omitted) (emphasis added).
In Payne III (the Balbino FLUM Amendment) this Court reversed a State of Florida Department of Community Affairs Final Order finding another small scale development amendment on the Miami River in compliance with Chapter 163, Part II, Florida Statutes. In Payne III, we noted that Lourdes Slazyk, the Assistant Director of the City’s Planning Department (a witness heavily relied on by Balbino in Payne III, Riverside in the instant case, and the dissenting opinion issued by the members of this Court who voted to grant en banc review (“the dissent”) in both Payne III and the instant appeal) agreed with this Court’s definition of the Port of Miami in Payne II and rejected the narrow definition argued on appeal.
In rejecting Balbino’s argument in Payne III, that the objectives and policies in the Port of Miami River subelement of the Comprehensive Plan do not apply to the Balbino property because it is not located on one of the original shipping company sites, we made specific findings which we repeat and adopt in this appeal.
First, it is undisputed that many of the fourteen shipping companies that were located at various sites along the Miami River in 1989 have moved, changed hands, or no longer exist, and that instead of fourteen shipping companies along the Miami River, there are now at least twenty-eight. Second, since the Comprehensive Plan’s enactment in 1989, the City adopted The Miami River Master Plan, which will be addressed more fully herein, and the City has amended and readopted the Comprehensive Plan. Third, it is also undisputed that the marine industry along the Miami River has grown substantially and has become an important economic asset to the City. The Miami River generates over $800 million in input, $427 million in income, $45 million in tax revenue per year, and provides employment to 7,500 people. The shipping industry along the Miami River is not only growing, further expansion is all but certain when the U.S. Army Corps of Engineers completes its dredging of the Miami River. It is, therefore, illogical to conclude that the City meant only to protect the original fourteen shipping companies along the Miami River when it drafted, enacted, amended and readopted the Comprehensive Plan. Thus, we reaffirm our position in Payne II and Payne III, that the “Port of Miami River” referred to in the Comprehensive Plan, as amended and adopted in 2004, is not limited to the fourteen shipping companies that existed in 1989.
Our conclusion is supported by the findings contained in the Miami River Master Plan, prepared by the City of Miami Department of Planning, Building and Zoning, and adopted by the City on January 23, 1992, by Resolution # 92-61. In this document, the City recognized that, although the Miami River is a navigable waterway used extensively for commercial shipping, it is not officially regulated as a port by state or local government; these commercial shipping operations are 100% owned and operated by private enterprise and, therefore, do not enjoy the structure, authority, and advantages normally associated with ports; the name “Port of Miami River” was simply coined in 1986 to satisfy a U.S. Coast Guard regulation governing bilge pumpouts; and there are currently between twenty-five and thirty independent shipping companies operating on the Miami River as opposed to the fourteen companies operating in 1989. Miami River Master Plan, River Management, Port of Miami River, 2.12 (Jan.1992). Indeed, *268 based upon this rather unusual structure, or lack thereof, the Miami River Master Plan stresses the need for a formal organization to manage the use of these facilities, providing, in part, as follows:
RECOMMENDATIONS
Policy:
2.4.9 Create an official “port” organization with responsibility to assist with enforcement of rules and regulations applicable to commercial shipping activity.
(a) Support the private sector efforts to fulfill the role of a port through a cooperative organization.
(b) If the private port cooperative fails to effectively manage shipping activity, establish a public port agency with legal authority to enforce regulations.
Id. at 2.13.
Additionally, included in Riverside’s January 26, 2006, FLUM submittal is a summary specifically addressing the Port of Miami River subelement. It reads as follows:
In 1988 The Port of Miami River consisted of approximately 14 independent shipping terminals, along the Miami River as shown in Figure IV-16, that were joined together in 1986 in order to comply with U.S. Coast Guard regulations regarding pumpout of bilge water.
The submittal lists the fourteen shipping terminals; discusses the services provided and the tonnage of cargo shipped; notes the estimated $1.7 billion value; and then addresses the Port of Miami River subelement as it currently exists:
As shown in Figure IV-19, in 1995 the Port of Miami River consists of about 28 independent shipping terminals located along navigable 5.5 miles of the Miami River that stretch from the salinity dam to the Biscayne Bay.
This document names the twenty-eight shipping terminals that existed in 1995 and which were considered the “Port of Miami River” at that time. While the document does not provide a more current list of the Port of Miami River entities, it is clear that Riverside accepted that the term “Port of Miami River” includes the shipping terminals along the river wherever they are located and regardless of the name or ownership.
Our finding is further supported by the testimony of Jack Luft. Jack Luft, who testified for the appellants, was accepted by the ALJ as an expert land planner based upon a stipulation by the parties. Mr. Luft was a land planner with the City for twenty-eight years; participated in the rewrite of the Comprehensive plan in 1978; was the senior project manager for several components of the Comprehensive Plan in the 1980’s; wrote master plans for various cities and areas, including Virginia Key, Dinner Key, Coconut Grove, downtown, Watson Island, Bicentennial Park, and a number of neighborhood revitalization parks; planned the Design District in the 1990’s; was a consultant for Sunny Isles Beach’s Comprehensive Master Plan in 2000; and is considered an expert for last year’s Comprehensive Plan. Additionally, Mr. Luft served as the Director for the Department of Development for the City and was involved in revitalization strategies for Little Havana and Little River, where he analyzed census information, income data, housing costs, and conditions to determine how to approach the revitalization of these communities.
Mr. Luft testified that “the Miami River Master Plan was adopted in 1992, and as a result of that, the port was introduced into the Comprehensive Plan to further the specific objectives of the Miami River Master Plan.” He noted that the Miami River Master Plan was a *269 “holistic view of the river,” designating different land uses along the river and creating a balance between the uses, while identifying the core of the sustainable marine river industries that must be protected and preserved as marine industrial. He testified that the Miami River Master Plan specifically mentions the Comprehensive Plan, which has the force of law behind it, lays the foundation for subsequent amendments to the Comprehensive Plan, and recommends the establishment of a “Port of Miami River.” In reliance of this background, Mr. Luft defines the “Port of Miami River” as:
[A] collection of shipping industries ... supported by a variety of marine water-related activities including tugboats, construction firms, repair, vessel maintenance, parts distribution, freight forwarders that are ah part of the network that makes the port operate. There [are] literally the container ships and the offloading and unloading and there is a subsidiary of groups that are essential and critical to provide that as an operation.
The port element speaks to maintaining and supporting those other dimensions of the port industry. It’s all a part, and therefore it is within the industrial area of the river, it is not confined to just a specific number of terminals that actually are supposed to expand and may expand in different locations within the industrial zone. So literally in my opinion the industrial zone and its associated industries that are all interconnected and interrelated are the port. That’s the way the port works. Without that support industry the port is not functional and not sustainable.
(Emphasis added).
Dr. Francis Bohnsack, the Executive Director of the Miami River Marine Group, and who serves as the Miami River Port Director for the United States Coast Guard as a liaison for the marine industry on the Miami River with local, state, and federal agencies, agrees with Mr. Luft’s definition of the Port of Miami River. She testified that the Port of Miami River includes the port facilities that are water-dependent, zoned SD-4, and regulated by the Coast Guard, customs, and the various federal, state and local agencies. It is, therefore, the position of both Mr. Luft and Dr. Bohnsack that the Port of Miami River includes the port facilities that are water-dependent, zoned SD-4, and regulated by the Coast Guard, customs, and the various federal, state, and local agencies.
The evidence supports Mr. Luft’s and Dr. Bohnsack’s conclusions that the Port of Miami River encompasses the water-dependent and water-related marine activity on the river, which includes the shipping companies and terminals and the associated supporting marine industries zoned SD-4 on the Miami River. Thus, the ALJ erred in concluding that because this particular property had not been used for shipping, the Port of Miami subelement was inapplicable.
This finding, however, is not dis-positive, because the ALJ concluded that even if the Riverside property fell within the definition of the property protected under the Port of Miami River subelement of the Comprehensive Plan, consideration of the objectives and policies contained in this subelement was not required because: (1) the Port of Miami River subelement is not a required element of the Comprehensive Plan; and (2) they do not apply to Riverside’s FLUM Amendment request. We disagree.
First, we disagree that section 163 does not require the inclusion of a port element to the City’s Comprehensive Plan, and the *270 Port of Miami River subelement is an “optional element.” Section 163.3177(6)(a) provides that the comprehensive plan shall include certain elements and specifies that “[f]or coastal counties the future land use element must include, without limitation, regulatory incentives and criteria that encourage the preservation of recreational and commercial working waterfronts as defined in s. 342.07 ...” Because the City is a “coastal” city, the Port of Miami River subelement is a required element of its Comprehensive Plan. But, more importantly, whether the Port of Miami River subelement is a required or an optional element of the Comprehensive Plan is irrelevant. The City’s Comprehensive Plan includes a port element and therefore, if an amendment application falls within its definitional parameters, the amendment must not be inconsistent with its goals, objectives and policies. Because Riverside’s FLUM Amendment submission falls within the definitional parameters of the Port of Miami River subelement, it must not be in conflict with it. Second, we disagree that Riverside’s FLUM Amendment need not be consistent with the Port of Miami River subelement because it only applies to land development, not land use.
Some of the objectives and policies found in the “Port of Miami River” subelement of the Comprehensive Plan that the ALJ failed to consider when he found that the FLUM Amendment was consistent with the Comprehensive Plan are:
Objective PA-3.1: The City of Miami, through its Land development regulations, shall help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, and shall regulate its expansion and redevelopment in coordination with the City’s applicable coastal management and conservation plans and policies.
Policy PA-3.1.1: The City shall use its land development regulations to encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River, and to discourage encroachment by incompatible uses.
Policy PA-3.1.2: The City shall, through its land development regulations, encourage the development and expansion of the Port of Miami River consistent with the coastal management and conservation elements of the City’s Comprehensive Plan.
Policy PA-3.1.3: The City shall, through its land development regulations, encourage development of compatible land uses in the vicinity of the Port of Miami River so as to mitigate potential adverse impacts arising from the Port of Miami River upon adjacent natural resources and land uses.
Objective PA-3.3: The City of Miami shall coordinate its Port of Miami River planning activities with those of ports facilities providers and regulators including the U.S. Corps of Engineers, U.S. Coast Guard, and Miami-Dade County’s Port of Miami.
Policy PA-3.3.1: The City of Miami, through its Intergovernmental Coordination Policies, shall support the functions of the Port of Miami River consistent with future goals and objectives of the Comprehensive Plan, particularly with respect to the unique characteristics of the Port of Miami River’s location and its economic position and functioning within the local maritime industry, and the necessity for coordination of these characteristics and needs with maritime industry that complements, and often competes with, the Port of Miami River.
Failure to consider these objectives and policies is material, as Riverside’s pro *271 posed land use is clearly inconsistent with the Port of Miami River subelement of the Comprehensive Plan. Objective PA-3.1 requires the City to “protect the Port of Miami River from encroachment by non-water-dependent or water-related land uses....” (emphasis added). This subelement also provides clear policy which requires the City through its land development regulations to encourage the maintenance of water-dependent and water-related uses along the banks of the Miami River and to encourage expansion of the Port of Miami River. Contrary to these objectives and policies, the City approved Riverside’s small scale FLUM Amendment to the Comprehensive Plan, changing the land use designation from Industrial to Restricted Commercial, and also permitted this parcel of land, located directly on the Miami River, to be rezoned from SD-4.2 Waterfront Industrial to Restricted Commercial, thereby allowing the construction of a mixed-use project, which is neither water-dependent nor water-related, to be built on the site, thereby limiting future expansion of the Port of Miami River.
The ALJ refused to consider these policies and objectives because he concluded that the Port of Miami River subelement applies only to land development regulations (zoning), and not to land use, which is what the FLUM Amendment addresses. Thus, he found that regardless of how we define the Port of Miami River, Riverside’s FLUM Amendment need not be consistent with the objectives and policies of the Port of Miami River subelement. The dissent agrees with this finding and further claims that the only issue before the ALJ was “the City’s legislative decision to reformulate its policy ... regarding this change. Because no land development, that is, zoning issues were involved, the ALJ properly refused to consider those parts of this sub-element.” (emphasis added).
The dissent also argues that “Planning is not zoning and changing the Plan does not automatically result in changing the zoning ... zoning follows planning ... planning is not affected by zoning ... a new use designation does not mean that the rezoning request will or must be granted ... and the fact that this parcel of property is zoned SD-4.2, is wholly irrelevant as to whether changing the land use designation of this property from Industrial to Restricted Commercial is consistent with the Port of Miami River sub-element.” These arguments, however ignore the fact that Policy PA-3.3.1 does not address land development regulations and is clearly relevant when considering a land use amendment, and also disregards the record in this case.
The record reflects that the Riverside property was zoned SD-4.2 Waterfront Industrial. Therefore, its land use designation was, by necessity, identified as Industrial. Industrial land use, coupled with the SD-4.2 land development classification, precludes any residential uses. The Industrial land use and the SD-4.2 Waterfront Industrial land development classifications were placed on this property to reserve and preserve it as a water-dependent or water-related Industrial use that could not be used for residential purposes. The Port of Miami River subelement was enacted to specifically protect the shipping industry by “encourage[ing] and maintaining] the water-dependent and water-related uses along the banks of the Miami River, and to discourage incompatible uses.” Policy PA-3.1.1. By changing the land use from Industrial to Restricted Commercial, the only water-related or water-dependent use permitted in that classification would be for a marina. More importantly, the FLUM Amendment will *272 permit residential use, a land use specifically precluded by the SD-4 land development classification. Thus, by changing the land use, the FLUM Amendment dramatically changes the permitted land development uses, and eliminates a specially designated site reserved by the City to support the shipping industry on the Miami River.
While we agree with the dissent that land use planning and zoning are separate issues which generally must be considered separately, even when amendments to both are presented together, we conclude that because both requests were tied together, dependent on the other, and the zoning amendment was the driving force and was essential to obtaining the land use amendment, the zoning amendment cannot be ignored in this case.
The record reflects that Riverside’s applications to the City to change the Comprehensive Plan by amending the Future Land Use Map from Industrial and General Commercial to Restricted Commercial, and to change the zoning from SD-4, Waterfront Industrial to C-l Restricted Commercial, were presented together, dependent on the other for approval, and approved together.
Lourdes Salzyk (to the City Commission): PZs (Planning and zoning) 29, 30, and 81 are related items. PZ.29 and 30 are the land use and zoning change for the Coastal on the River project. This is located at approximately 2215 Northwest 14th Street. The request is from Industrial to restricted commercial, with the zoning change going to C-l ... PZ. 31 is the Major Use Special Permit. This is for — to construct [a] two-building residential development ranging in height from 110 to 120 feet. The project will have a total of 633 multifamily residential units....
[[Image here]]
Mr. Dickman: The proposed development requires this Commission to alter the City’s Comprehensive Neighborhood Master Plan future land use map, rezone the property and grant a special permit to build a high-density residential project [ ] on the property that is currently designated for marine/industrial uses on the Miami River.
Additionally, Ms. Slazyk testified before the AL J that the land use Amendment was filed with Riverside’s request for a zoning change and a major use special permit, and that the major use special permit is the “umbrella” under which the land use and land development changes are made:
[W]hen an applicant files a major use special permit which includes a request for a land use change and zoning change, they file it together in a three-ring binder with all of the required documents for the three requests that are going to the City Commission. The major use special permit is kind of seen as the umbrella that the other requests travel as companion items to, so the major use special permit book includes all of the applications and backup documentation and data and analysis for the project.
Ms. Slazyk also admitted that while the zoning classification is more specific than the land use designation, the two classifications must be consistent. Because this parcel of land is located in a special district, SD-4.2 Waterfront Industrial, the land use must, by necessity, be Industrial. It would be inconsistent to amend the land use to Restricted Commercial and not also amend the Waterfront Industrial zoning classification, and impossible to change the zoning classification without also amending the land use map. Because this property is located in a special district the land use and land development classifications are dependent on each other.
*273 This parcel of land has always been used for marine industrial purposes. Prior to Riverside’s purchase of the land, it was owned and used by Coastal Tug and Barge. Riverside’s purchase of the land was contingent upon a successful change in its land use and zoning, and in obtaining a MUSP. Therefore, the land use change is clearly tied to the zoning change and MUSP.
Riverside’s FLUM Amendment is clearly inconsistent with the following mandates found in the previously cited objectives and policies listed in the Port of Miami River subelement of the Comprehensive Plan and which the ALJ refused to consider: Objective PA-3.1, which requires the City to “protect the Port of Miami River from encroachment by non water-dependent or water-related land uses;” Policy PA-3.1.1, which requires the City to “encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River ... and to discourage encroachment by incompatible uses;” Policy PA-3.1.2, which requires the City to encourage the development and expansion of the Port of Miami River; Policy PA-3.1.3, which requires the City to “encourage development of compatible land uses in the vicinity of the Port of Miami River;” and Policy PA-3.3.1, which requires the City to “support the functions of the Port of Miami River consistent with future goals and objectives of the Comprehensive Plan, particularly with respect to the unique characteristics of the Port of Miami River’s location and its economic position and functioning within the local maritime industry.”
The FLUM Amendment is inconsistent with these objectives and policy decisions because of its location. The Riverside property, prior to being purchased by Riverside, was owned by Coastal Tug and Barge. Coastal Tug and Barge operates out of the Port of Miami and used this site to store its tugboats. The Riverside property also has a clear bulkhead with finger piers suitable for loading and unloading cargo from commercial vessels. Directly to the west of the Riverside property is Detroit Diesel. Detroit Diesel is an engine and gear repair facility for boats, buses, and trucks. The Detroit Diesel property also has a sizable bulkhead with several boat slips to enable it to perform work on sport fishing boats and small yachts. To the west of Detroit Diesel is the Florida Yacht Basin, used to tie up ships, casino boats, and other boats. On Riverside’s eastern boarder is a shipping terminal, River Marine Services, where cargo is loaded onto the ships transporting goods and materials to the Caribbean. And across the River is Antillean Marine, another shipping company and shipping terminal.
Jack Luft, Chief of the Urban Design Division when the City’s 1989-2000 Comprehensive Plan was created (and Lourdes Slazyk’s direct supervisor) testified that the Riverside property sits on the single greatest concentration of marine industries anywhere on the Miami River. The lineal bulkhead shoreline of the Riverside property and the Waterfront Industrial properties on either side of Riverside, constitutes over 3,000 lineal feet of consistent marine industrial shoreline, and the actual lineal feet of embayments of piers and slips is almost 6,000 lineal feet of shoreline, which is seventy percent of the size of the Port of Miami on Dodge Island. Mr. Luft testified that due to the ability to aggregate the Industrial uses and because it is such a significant area with compatible marine uses, it provides a unique opportunity for the marine industry to invest, develop, and grow and not face the incompatibility and encroachments by other uses that would be disruptive to the marine industry.
He also explained:
*274 As a land planner one typically follows natural division of land use, natural clusters of use. You would not take a residential neighborhood and put an apartment in the middle of the block. You would not do that because it would completely break down the uses threatening the land use. When you take this property, you are effectively creating a spot map. A spot plan amendment. It stands alone and it creates a — an issue for the land planner to explain why that property was given this particular unique treatment as opposed to the properties on either side of it that share the same circumstance. And as a land planner I cannot explain why one property was singled out for that special treatment while the others were retained as industrial without having to explain why the others should not receive the same treatment.
Rather than encouraging the establishment and maintenance of water-dependent, water-related uses along the banks of the Miami River, discouraging encroachment by incompatible uses, encouraging development of compatible land uses, and supporting the functions of the Port of Miami River consistent with the future goals and objectives of the Comprehensive Plan, the City approved the Riverside FLUM Amendment, eliminated the ability of the marine industry to use this Waterfront Industrial site to expand and service the marine industry, and created an incompatible use, and, in fact, created a “spot plan amendment.” In fact the City, in approving this Amendment, recognized that its decision would create incompatible uses and conflict.
Commissioner Winton: Let me tell you what my initial concern was; just in looking at the aerial here. My initial concern was about the conflict in uses because, regardless of what they’re repairing at Detroit Diesel ... it’s still relatively heavy industrial use, and it’s noisy, and they work at night, and then you’ve got — Antillean across the — on the other side of the street?
Vice Chairman Gonzalez: Antillean is on the other side of the river.
[[Image here]]
Commissioner Winton: Yeah, and so I was looking at that use also, so you were going to — here is what I was concerned about. I was concerned that — because you’re going to have to deal with it. You build a residential complex there, sandwiched between two industrial complexes — and the battles are going to be wild.... Putting this residential component between two industrial uses is going to be a nightmare .... and industrial and residential are incompatible uses, terribly incompatible uses ... so if we’re going to convert that one, I’m simply saying, we need to be looking at a bigger picture and create a zone where you have compatibility.... I mean ... non-marine industrial use or a marine industrial use next to a residential use, those are incompatible uses, just from a long-term planning standpoint, so I’m just simply saying I think we ought to do one or two things. We should either not do this one, or we should require staff to look at and figure out how you link up the appropriate number and do a number so that you end up with a zone of compatible uses.... Either do three, or, four, or five of them, or do none.
The dissent claims that the City made a legislative decision to reformulate its policy in approving the FLUM Amendment. The record reflects quite the contrary. Despite the concern of some of the Commissioners regarding the incompatibility and conflict their approval of the FLUM Amendment, zoning change and MUSP would create, and their expressed need for *275 a comprehensive approach and a clear policy regarding the Miami River, the City approved Riverside’s applications without performing that review or making a legislative policy decision.
Mr. Dickman (attorney for the appellants): The Port of Miami River is the fourth largest port in Florida, and has been recognized by the City’s Comprehensive Plan as [] unique and vital to the City. As a matter of law, you must follow your policies that protect the port and encourage expansion of the port. That’s what your Comprehensive Plan says; yet month after month you have approved small-scale future land use amendments and piece by piece you are slowly dismantling the river industry. ... [U]nder the state growth management act, you’re required under comp, plan amendments to be looking at the cumulative impact. All of these things that you have approved in the last couple years, and the ones that are in the pipeline, you have to look at how much acreage is being lost. Is there a need or not for the industry locations? Is there a need for more residential housing on the river? You’re not doing that in a comprehensive planning way. You’re looking at these case by case. These case by case decisions are illegal, and they are, more importantly, improper long-range planning.... Let’s sit down and .... put a plan together so that my clients, the industry, can predict what’s coming down the road; can understand what the City’s and your vision is for the river.
[[Image here]]
Ms. Dougherty (representing Riverside): At one point, we had a conference, a required mediation conference in connection with Hurricane Cove [the Balbi-no small scale FLUM Amendment approved by the City across the Miami River, on property owned by the same developer as the Riverside property and the subject of a separate appeal, previously referred to in this opinion as Payne III] and I suggested we sit down and look at this comprehensively and decide where we’re going from a comprehensive standpoint. At that time it was rejected.
We conclude that the ALJ erred in refusing to consider the Port of Miami River subelement, and find that had he done so, the inescapable legal conclusion would have been that the FLUM Amendment is inconsistent with the Comprehensive Plan. Based on the record, we also reject the notion that the City’s decision to grant the FLUM Amendment was made after legislatively reformulating its policy regarding the overall vision of the Miami River.
B. Coastal Management
The Comprehensive Plan also contains a section or subelement, titled “Coastal Management,” which addresses the coastal areas located within the City. One of the goals specified in this section is to “[pjrovide an adequate supply of land for water dependent uses.” Goal CM-3. In order to accomplish this goal, Objective CM-3.1 provides: “Allow no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami.” (emphasis added). Moreover, Policy CM-3.1.1 states: “Future land use and development regulations will encourage water dependent uses along the shoreline.”
Despite the stated goals, objectives, and policies regarding the coast of the Miami River, the City approved the Riverside FLUM Amendment to the Comprehensive Plan, changing the land use designation from Industrial to Restricted Commercial and approved a change in the zoning from SD-4.2 Waterfront Industrial to Restricted Commercial. These changes will pre- *276 elude the very use the Comprehensive Plan specifies should be protected and it is obviously a net loss of acreage devoted to water-dependent use, thereby conflicting with Coastal Management Goal CM-3. Instead of providing an adequate supply of land for water dependent uses, allowing no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami, and using its land use regulations to encourage water dependent uses along the shoreline, the City approved this land use change to enable it to eliminate the special Waterfront Industrial zoning and avoid the restriction against residential development. The result is an obvious net loss of acreage devoted to water-dependent use and decreases the available supply of land for water-dependent uses without conducting a study and determining whether an adequate supply of land for water-dependent uses still remains.
The FLUM Amendment and zoning changes to Restricted Commercial, with the concurrent approval by the City to allow Riverside to construct two twelve-story multi-family residential buildings with 633 residential units that are neither water-dependent nor water-related, is clearly inconsistent with the goals, objectives, and stated policies of the Coastal Management section of the Comprehensive Plan. The ALJ, however, failed to address or even consider Coastal Management Goal CM-3 in his Recommended Order, focusing solely upon Goal CM-4, which relates to safety issues regarding hurricanes. Had the ALJ properly considered Goal CM-3, the inescapable conclusion would have been that this FLUM Amendment is inconsistent with the Comprehensive Plan.
The Comprehensive Plan’s goals, objectives, and policy considerations regarding coastal areas, and specifically those coastal areas along the Miami River, are in recognition of how important the shipping industry and other water-dependent uses are to the City’s economy.
In view of the importance to the local economy, the limited available areas suitable for high intensity water dependent uses, and strong population pressures of the 1960’s, the City created in the mid 1960’s a zoning classification entitled Waterfront Industrial. This zoning classification strictly prohibits uses that are not directly related to waterfront activities.
[[Image here]]
Since any new water dependent or related facilities would involve redevelopment of existing waterfront properties, these zoning ordinances are considered sufficient to insure that adequate land area for water-dependent or related uses is protected.
[[Image here]]
Along the Miami River, an economic study in 1986 reported that the firms located in the study area ... have a significant impact on the Miami economy. They employ an estimated 7,000 workers on a full time basis and over 600 part time. Total sales are estimated at $613 million, or about $87,000 for a full time worker. An additional indirect impact of $1.2 billion of business activity in the Miami area is created by firms in the study area. Many of the firms located in the study area are marine related businesses in part composed of water dependent and water related activities.
Miami Comprehensive Neighborhood Plan 1989-2000, Volume II, Data and Analysis, Coastal Management Element (emphasis added).
The ALJ, however, failed to consider the importance of the marine industry to the City’s economy or to appreciate that the Industrial land use designation and Waterfront Industrial SD-4 zoning classification *277 were created to protect those uses and to ensure that there will be adequate land area for water-dependent and water-related uses. Because there was no evidence presented, nor was a study performed, to evaluate the sufficiency of the remaining SD-4 zoned land along the Miami River, in light of the recent[3] and expected future increases in shipping and other related marine services along the river due to the dredging of the Miami River, the ALJ had insufficient evidence to conclude that the FLUM Amendment for this parcel of land is consistent with the Comprehensive Plan and would be beneficial to the community.
C. Future Land Use
As with the two preceding sections of the Comprehensive Plan, the ALJ made findings that were unsupported by competent evidence and he failed to consider important relevant goals contained in the Future Land Use section of the Comprehensive Plan.
The Future Land Use section of the Comprehensive Plan provides that one of its future land use goals is to “[m]aintain a land use pattern that (1) protects and enhances the quality of life in the city’s residential neighborhoods; (2) fosters redevelopment and revitalization of blighted or declining areas; (3) promotes and facilitates economic development and the growth of job opportunities in the city ... and (6) protects and conserves the city’s significant natural and coastal resources.” Goal LU-1.
The ALJ found that the FLUM Amendment is consistent with Goal LU-1 (1) because Durham Park, a residential community, abuts the Riverside property and the FLUM Amendment “will eliminate the potential for development of industrial uses that may generate ‘excessive amounts of noise, smoke, fumes, illumination, traffic, hazardous wastes, or negative visual impact[,]’ ” and therefore improve the quality of life of the surrounding neighborhoods, such as Durham Park. This finding is unsupported, and is, in fact, contrary to the evidence. Durham Park does not abut the Riverside property, it is several hundred feet from the Riverside property. More importantly, the Riverside property is zoned SD-4.2, Waterfront Industrial, it is located within four contiguous Waterfront Industrial uses, and collectively, these four properties represent the single greatest concentration of SD-4 Industrial land along the Miami River in the City. The bulkhead shoreline of these properties constitutes over 3,000 linear feet of marine industrial shoreline. As stated earlier, directly to the west of the Riverside property is Detroit Diesel, a repair facility for boats, buses, and trucks, and has a sizable bulkhead containing several boat slips where it repairs sport fishing boats and small yachts. To the west of Detroit Diesel is the Florida Yacht Basin, which was used to store ships during the hurricane season and is currently being used to tie up, paint, and repair ships and yachts. On Riverside’s eastern border is River Marine Services, a shipping operation where cargo is loaded onto ships transporting goods and materials to the Caribbean, and Bri-sas, which previously operated as a repair and storage facility for private and commercial vessels.[4] Thus, a 633-unit residential facility located in the middle of *278 these marine operations is hardly consistent. Additionally, Durham Park objects to the proposed FLUM Amendment.
Durham Park, a community of single family homes and boat owners, objects to the proposed FLUM Amendment because it depletes marine uses along the river, and changes the land use designation to one which will permit a density of 150 dwelling units per acre with no height limitation, thereby allowing the proposed construction of 633 dwelling units on this 4.3-acre site, with an expected occupancy of approximately 1,600 new residents. A representative for Durham Park explained that these new residents will substantially strain the N.W. 22nd Avenue crossing over the Miami River which is already plagued by troublesome delays. Thus, the ALJ’s conclusory finding, that the proposed land use is consistent with Goal LU-1 of the Future Land use section of the Comprehensive Plan because it will protect and enhance the quality of life in that neighborhood, is not only unsupported by the evidence, but contrary to it.
The ALJ also failed to consider the effect this FLUM Amendment would have on the “quality of life” of the Riverside unit owners who will find themselves surrounded by industrial uses that do create noise, smoke, fumes, illumination, hazardous wastes, and negative visual impact. Gerry Cafiero holds a bachelor’s degree in marine engineering and marine transportation; is a certified chief engineer for the Department of Transportation; served as the Director of Operations for the Port of Miami for eight years, as the Facility Director for Solid Waste for ten years, and as Chief Engineer in the Merchant Marines for three years sailing on various vessels throughout ports all over the world; and is currently a consultant to the seaport industries regarding master planned land uses, terminal operations, security, and seaport infrastructure. Mr. Cafiero testified that the impact to the marine operations in close proximity to the Riverside residential units would be “very devastating.” He explained that the current shipping and cargo operations surrounding the Riverside property operate 24/7 and create noise, dust, pollution, lighting and security issues — that buffer zones are needed for these marine facilities. And as several Commissioners noted, by approving this FLUM Amendment, they would be creating an “incompatible use.” These Commissioners recognized that “putting this residential component between two industrial uses is going to be a nightmare ... industrial and residential are incompatible uses, terribly incompatible uses.”
The ALJ’s finding that “the Allapattah neighborhood, in which the subject property is located, is an area in decline and mixed-use projects that include work forces and affordable housing will help stabilize the area by providing housing opportunities for employees at the Civic Center and in downtown who want to live near where they work,” is also unsupported by the record and it is based upon a false premise that undermines all of the ALJ’s findings. The Riverside property is not located in Allapattah. While it is located in the Allapattah Planning District, it is not located in the Allapattah neighborhood. It is not even located on the same side of the Miami River as is the Allapattah neighborhood. Riverside’s property is located in Grapeland Heights, which is in a stable middle-income area, not a blighted area or an area that is in decline. It is located within a working waterfront quadrant, near a shipping company and next to a marine-related business and near Durham Park, a single-family residential neighborhood.
*279 Goal LU-1(3) of the Future Land Use section of the Comprehensive Plan provides as one of its future land use goals is to “[mjaintain a land use pattern that protects and facilitates economic development and the growth of job opportunities in the city.” The ALJ concluded that the FLUM Amendment is consistent with this goal because it will provide housing and employment opportunities for people who work in the nearby Civic Center area. He found that the appellants’ argument that it was inconsistent with this goal was disputed by the testimony of Herbert Payne, who owns a marine-related business. Mr. Payne testified the he hasn’t used the property for four or five years and he didn’t know how many marine job opportunities would be lost due to the Amendment. Again, the ALJ’s findings are unsupported and disputed by the record, and whether Mr. Payne has used property he does not own or have a business on, is irrelevant.
We begin with the ALJ’s premise that because the subject property is near the Civic Center, it will provide housing for the Civic Center workforce. There was no evidence presented that there is a need for additional housing to support the Civic Center or the City’s workforce. The City’s expert, Lourdes Slazyk, admitted that no needs analysis (for either industrial uses or housing) was performed because they believed none was required for a small scale amendment. Additionally, the evidence presented disputes a current need for additional housing in the City. At the time of the hearing, there were 95,000 units being built or to be built in the City, with a projected population increase of 229,000. That number is astounding considering that Ms. Slazyk testified that the City’s population at the time of the hearing was between 300,000 and 400,000 people.
There was no evidence presented that the City expects to nearly double its population or that the 95,000 units already being built would not sufficiently provide the housing needs of the Civic Center and downtown areas. And, while the property is in an “infill zone,” based on the City’s ordinance declaring the entire City an infill zone, and in recognition that the subject property is not in a community development target area, this argument carries little, if any, impact.
We next address the economic component of the ALJ’s findings — that the FLUM Amendment will protect and facilitate economic development as required by Goal LU-1(3) of the Comprehensive Plan. Jack Luft testified that the FLUM Amendment was inconsistent with this goal because rather than encouraging expansion of the marine industry which does provide jobs, it “undermines the economic viability of the remaining industrial land, invites speculation that make[s] it impossible for that industry to expand ... impacts an entire array of subsidiary and support industries that the plan seeks to protect ... and create[s] a circumstance where it is no longer economically viable to operate a marine industry on the river.”
Mr. Luft explained that because of the economic advantage of ensuring the viability and expansion of the marine industry on the Miami River, when he was a senior planner with the City’s Planning Department, he brought in an economic consultant to perform an economic analysis of the marine industries on the Miami River and to provide the City with a profile for changing the land uses along the River. No such study was performed by the City prior to its recent approvals of the small scale land use amendments on the Miami River. In fact, when it was suggested that the City sit down and look at the Miami River’s land uses comprehensively, rather *280 than amending the uses in this haphazard manner, the City rejected the suggestion. Instead, as Mr. Dickman noted, the City has “month after month ... approved small-scale future land use amendments and piece by piece [the City is] slowly dismantling the river industry.”
Mr. Luft further explained that the genesis of the Miami River Master Plan, which will be addressed separately in this opinion, was to accomplish the goals and objectives of the Comprehensive Plan by preserving the marine-related industries on the Miami River. An entire section of the Miami River Master Plan deals with land values and explains the dynamic of how high density, high intensity uses work to displace and economically threaten the viability of the marine industries.
The Miami River’s economic benefit to the City is undisputed. Evidence presented at the hearing clearly establishes that fact. Florida’s maritime trade with twenty-nine nations and territories in the Caribbean Basin pass through the Miami River, providing nearly twenty percent of the nation’s $22.1 billion in trade with the Caribbean Basin. A study conducted in 2001 by the Miami River Commission, the Beacon Council, and the City, reflects that the Miami River serves approximately one hundred ports of call (up from sixty-two in 1991) generated $216 million in revenues for the marine related businesses on the Miami River, and that jobs along the River have tripled in the last ten years, amounting to a $35 million payroll. In 2005, with forty percent of the Miami River maintenance/dredging project completed, the industry already began to see further growth. Five marine industrial businesses opened on the Miami River in 2005 including two new international terminals and two new recreational boatyards, generating new local jobs and tax revenue. In April 2005, it was determined that waterborne commerce on the Miami River had generated $805 million in output, $406 million in income, 6,700 jobs, and $44 million in tax revenues.
The ALJ also failed to address LU-1(6), which requires the City to “[mjaintain a land use pattern that protects and conserves the city’s significant natural and coastal resources.” Since 2000, fifty percent of the properties designated for marine industrial water-related and water-dependent uses along the banks of the Miami River have been lost due to the multiple small scale land use amendments passed to make way for residential high-rises. These small scale amendments do not require the scrutiny that is normally required to amend the Comprehensive Plan. Therefore, developers, with the City’s approval, have been compromising the marine industry and, in effect, changing the Comprehensive Plan piecemeal, rather than performing a comprehensive review with appropriate public and governmental input and oversight. The Riverside FLUM Amendment is an example of this piecemeal alteration of the City’s coastal resources, and when viewed in conjunction with the other small scale amendments, dramatically affects the stated goals and objectives to preserve the Miami River as a working river, to protect the marine industries along the river, and reserve a sufficient amount of waterfront industrial land for expansion of water-dependent and water-related uses.
Despite the FLUM Amendment’s conflict with the overall goals, objectives, and policies specified in Goal LU-1 of the Future Land Use section of the Comprehensive Plan, the ALJ upheld Riverside’s FLUM Amendment because he found that it was consistent with Policy LU-1.3.6, which encourages “diversification in the mix of industrial and commercial activities and tenants” in certain areas, including the *281 “River Corridor.” The ALJ, however, precluded testimony by the appellants regarding this issue. Additionally, while diversification and mixed-use classifications may be desirable in certain locations along the Miami River, the Comprehensive Plan and the River Master Plan make it clear that these goals only apply to appropriately zoned areas, not to land reserved for waterfront industrial purposes:
Goal CM-3: Provide an adequate supply of land for water dependent uses.
Objective CM-3.1: Allow no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami.
Miami Comprehensive Neighborhood Plan 1989-2000, Volume II, Data and Analysis, Coastal Management Element: In view of the importance to the local economy, the limited available areas suitable for high intensity water dependent uses, and strong population pressures of the 1960’s, the City created in the mid 1960’s a zoning classification entitled Waterfront Industrial. This zoning classification strictly prohibits uses that are not directly related to waterfront activities.
River Master Plan, 0.2: The function of the Miami River as a “working waterfront” should be preserved. Scarce waterfront land should be reserved, wherever possible, for use by businesses that are dependent on a waterfront location or are essentially related to the maritime economy of the area.
River Master Plan, Urban Design 4.20: New housing construction should be encouraged, except on lands reserved for water-dependent uses.
River Master Plan, Urban Design 4.20, Objective 4.8: Encourage residential development on appropriately zoned lands in the Mid-River area.
(Emphasis added).
We therefore find that the ALJ’s findings that Riverside’s FLUM Amendment is consistent with the Future Land Use section of the Comprehensive Plan is unsupported by the evidence presented. We conclude, that based on the evidence actually presented, it is clearly inconsistent.
MIAMI RIVER MASTER PLAN
(“River Master Plan”)
The River Master Plan is the result of a planning study undertaken by the City of Miami Department of Planning, Building and Zoning, to provide a long-range and a short-range vision of the Miami River as a “working waterfront.” The River Master Plan provides a pattern of land use that encompasses this “vision” and was intended to offer certainty in the marine industry for potential expansion and investment. To accomplish these goals, the River Master Plan specifically provides that:
The function of the Miami River as a “working waterfront” should be preserved. Scarce waterfront land should be reserved, wherever possible, for use by businesses that are dependent on a waterfront location or are essentially related to the maritime economy of the area.
The river should grow as a shallow draft seaport — a lifeline to the Caribbean Basin — providing good-paying jobs for city residents. New shipping terminals should be located where they will not be detrimental to residential neighborhoods.
The river’s role in the regional market for repair, sales and service of boats and marine equipment should be maintained and strengthened.
*282 The marine character embodied by the fishing industry on the river should be preserved.
River Master Plan, Executive summary, at 0.2 (emphasis added).
The River Master Plan addresses the limited availability of land suitable to development and expansion of water-dependent marine businesses, stating in pertinent part:
Within Dade County, there is estimated to be only 13.7 acres of undeveloped landt[5] with suitable water access and zoning to permit expansion of water-dependent marine businesses. Of that total, 8 acres are located on the Miami River. Given the economic significance of the marine industry, particularly in terms of the type and number of jobs created, it is important to prevent encroachment upon the limited amount of land available for growth of marine activities in the Miami River area.
[[Image here]]
RECOMMENDATIONS
Objective:
1.1 Reserve the limited amount of waterfront land available for expansion of marine industries.
Policies:
163.3.1 Retain and enforce the requirement for water-dependent and water-related uses within areas currently designated SD-4 in the City of Miami.
River Master Plan, The Working Waterfront at 1.4-1.5 (emphasis added).
The River Master Plan also specifically addresses the SD-4 zoning designation for coastal areas along the Miami River to provide protection from intrusion by non-water-dependent or related uses.
In the City of Miami, marine industries along the Miami River and its tributaries are protected by a special zoning designation from intrusion by other uses that are not dependent on a waterfront location. This special zoning is called “SD-4, Waterfront Industrial Special District.” It is intended for application in areas appropriately located for marine activities, to limit principal and accessory uses to those reasonably requiring waterfront locations, and to exclude residential, general commercial, service, office or manufacturing uses not primarily related to waterfront activities.
River Master Plan, The Working Waterfront, at 1.12 (emphasis added). The River Master Plan further divides the SD-4 zoning classification into two categories: SD-4.1, Waterfront Commercial and SD-4.2, Waterfront Industrial. Waterfront Commercial SD-4.1 includes marinas, boatyards, fisheries, boat sales and service, mixed use, and limited restaurant or residential with water dependent use. Waterfront Industrial SD-4.2 includes shipping terminals, marine contractors, commercial shipyards, towing, and salvage, and all SD-4.1 uses, except residential.
This waterfront zoning classification was recommended by City planners in 1956, was adopted by the City in 1961, and generally remained intact until recent years when the City began approving small scale amendments to the Comprehensive Plan and the concurrent zoning changes. Riverside’s property is zoned SD-4.2, Waterfront Industrial property, and therefore, is reserved for waterfront *283 industrial purposes and specifically excludes any residential use.
The City, Riverside, the ALJ, and the dissent all contend that, because the subject property is located in the “Mid-River” section where most of the existing housing is located along the Miami River, a change from an Industrial land-use, zoned SD-4.2, Waterfront Industrial, to a mixed-use residential Restricted Commercial designation, is consistent with the area’s land use. We disagree. First, it is questionable whether the Riverside property is located in the Mid-River. But, more importantly, whether the property is located in the Mid-River or the Upper River is not dis-positive, because although the River Master Plan, relied on by the City, Riverside, and the ALJ, recognizes the importance of housing opportunities in the Mid-River area, it specifically limits its application to land not reserved for water-dependent uses. The evidence is as follows.
The Miami River runs northwest to southwest for approximately five miles from the Miami International Airport to Biscayne Bay. For planning purposes, it has been divided into three sections: the Upper River, the Mid-River, and the Lower River. Because the ALJ concluded that the “best evidence” is that the Riverside property is located in the Mid-River section, and he based his findings on this conclusion, we will briefly address the issue.
The Riverside property is located at 2215 N.W. 14th Street. The witnesses disagree as to whether the property is located in the Mid-River or the Upper-River. Lourdes Slazyk testified that the City “considers” the Upper River as extending from N.W. 42nd Avenue to N.W. 27th Avenue. The City’s conclusion is based on the Miami River Master Plan’s demarcation of the boundaries of the three sections, and because it believes that the character of the river changes substantially from N.W. 27th Avenue to N.W. 42nd Avenue. Brett Bibeau, the Managing Director of the Miami River Commission disagrees. He testified that the Upper River ends at N.W. 22nd Avenue, not N.W. 27th Avenue. He relies on the Miami River Commissions’s own economic and market report, the Miami River Greenway Action Plan, and the Miami River Corridor Infill Plan, which all set the boundary at N.W. 22nd Avenue. Thus, the City places the Riverside property in the Upper River, and Brett Bibeau, the Managing Director of the Miami River Commission, places it within the Upper River.
The Miami River Commission was statutorily created by the Florida Legislature in 1998 to serve as the official coordinating clearinghouse for public policy and projects related to the Miami River. The enabling legislation created an eighteen-member Board. The members of the Commission are the South Water Management District, the Chair of the Marine Council, the Governor or a designee, a Florida State Representative, the County Mayor, the City Mayor, one City Commissioner, one County Commissioner, the State Attorney, a member at large appointed by the Governor, the Chair of the Miami River Marine Group, the Executive Director of the Downtown Development Authority, a member of the Greater Miami Chamber of Commerce, a neighborhood representative appointed by the City Commission, a neighborhood representative appointed by the County Commission, a member at large appointed from each the City and the County Commissions, a representative from the environmental or civic organization appointed by the Governor, and two ex-officio members.
One of the duties of the Miami River Commission is to make recommendations to the City and the County on any agenda *284 item pertaining to the Miami River.[6] The Miami River Commission considered Riverside’s FLUM Amendment request at a public hearing and did not approve it.
The Miami River Master Plan, which was adopted by the City in 1992, divides the upper River and the Mid-River at N.W. 27th Avenue, thereby placing the Riverside property in the Mid-River. On the other hand, the 2001 Miami River Economic and Market Report published by the Miami River Commission, identifies the Mid-River as running from the 5th Street bridge to the 22nd Avenue bridge, which puts the Riverside property in the Upper River. The Miami River Greenway Action Plan, which was also adopted by the City (and the County) also show the Mid-River as extending from the 5th Street bridge to the 22nd Avenue bridge. And, the Miami River Corridor Infill Plan, which was adopted by the County, and partially adopted by the City also draws the line between the Upper and Mid-River sections at the 22nd Avenue bridge.
While it would appear that the greater weight of the evidence supports a finding that the Riverside property is located in the Upper River, rather than the Mid-River as the ALJ concluded, we find that whether the property is in the Upper or Mid-River section is not dispositive. The ALJ’s finding that the Riverside FLUM Amendment is consistent with the area’s land use because the subject property is located in the Mid-River section, where most of the existing housing opportunities are located along the Miami River, completely ignores the very document that it relies on in deciding what section of the River it is in — the Miami River Master Plan. While the Miami River Master Plan recognizes the importance of housing opportunities in the Mid-River area, it specifically limits its application to land not reserved for water-dependent, water-related uses.
Residential Development
[[Image here]]
A number of opportunities remain for development of new housing by building on vacant lots or by increasing the density of existing developed lots. New housing construction should be encouraged, except on lands reserved for water-dependent uses. In the proposed SD-4.1 Waterfront Commercial zoning district (see page 1.14) residential development could be permitted as an accessory use to a marina.
[[Image here]]
Objective:
4.8 Encourage residential development on appropriately zoned lands in the Mid-River area.
River Master Plan, Mid-River, at 4.20. (emphasis added). Riverside’s property, which is zoned SD-4.2, Waterfront Industrial, therefore, is specifically excluded from the City’s stated residential development goals along the Mid-River. Even SD-4.1, Waterfront Commercial zoned land may only include residential development as an accessory use to a marina.
Additionally, because the Riverside property is surrounded by Waterfront Industrial land uses (which precludes residential uses), a land use change to Restricted Commercial, which would allow residential, is incompatible with the surrounding land uses. As Jack Luft stated: the Industrial land use classification does not allow residential use because it is considered incompatible. Mr. Luft testified that even if the Riverside property was deemed to be located in the Mid-River *285 quadrant, and certain locations in the Mid-River are appropriate for Restricted Commercial, this is not one of them. Mr. Luft explained that there is property much closer and within walking distance to the Civic Center, along largely vacant or undeveloped Industrial shoreline (primarily on the North Shore), that would be excellent locations for development, and particularly for high-density residential development. In contrast, the Riverside property is located along the working waterfront, and it is not within walking distance to the Civic Center nor to mass transit.
Lastly, the River Master Plan recognizes that higher land values and the concomitant increase in property taxes would result in the displacement of marine businesses and that the SD-4.2, Waterfront Industrial zoning was created, in part, to protect the maritime industry along the Miami River from being priced out of the location. It, therefore, provides for specific objectives and policies to protect these marine businesses from displacement by higher land values.
Land Values
One issue which directly affects the continued viability of marinas and small boatyards, as well as other businesses along the Miami River, is that of increasing land values and the concomitant increase in property taxes. Clearly this has been the case in the Downtown portion of the river and has resulted in the displacement of marine businesses with office buildings....
[[Image here]]
RECOMMENDATIONS
Objective:
1.3 Preserve the marine repair, service, equipment and related industries along the Miami River that are vital to the shipping industry or the recreational boating industry.
Policies:
163.3.1 Protect boatyards and related marine businesses from displacement by higher land values uses by adopting separate “marine industrial” and “marine commercial” zoning district classifications.
River Master Plan, Marinas and Boatyards, at 1.9. Riverside’s FLUM Amendment, changing the land use designation from Industrial to Restricted Commercial, is clearly inconsistent with the objectives and policy considerations relating to property values. Riverside’s 633-unit residential towers will most likely raise the property values and taxes, not protect them, thereby creating a financial strain on smaller marine businesses critical to the working waterfront. The ALJ erred in failing to consider this issue in finding that the FLUM Amendment was consistent with the River Master Plan.
Inexplicably, the dissent and the ALJ ignore the River Master Plan despite its adoption by the City in 1992 and the fact that the parties referenced its provisions throughout the proceedings. Perhaps this oversight is due to the clear language contained in the River Master Plan that requires the City to protect the “working waterfront,” preserve the waterfront locations reserved for the maritime industry, and prevent encroachment upon the limited amount of land available along the Miami River for growth of maritime activities on and along the River.
MISCELLANEOUS
Concurrency:
Section 163.3180(l)(a) provides that concurrency requirements regarding sanitary sewer, solid waste, drainage, potable water, and transportation facilities be met. Additionally, Florida Administrative Code *286 Rule 9J-5.005(2)(a) provides that “[a]ll goals, objectives, policies, standards, findings and conclusions ... within plan amendments and their support documents, shall be based upon relevant and appropriate data and the analyses applicable to each element.” While Rule 9J-5.005 does not require the City or Planning Department to personally compile the original data and perform its own original analysis, it does require review of the applicable data and that it be provided by acceptable existing sources. Rule 9J-5(2)(a) further specifies that “[a]ll tables, charts, graphs, maps, figures and data sources, and their limitations, shall be clearly described where such data occur in the above documents,” and that the Department must determine whether the data was “collected and applied in a professionally acceptable manner.”
The only record evidence relating to concurrency is a one-page “analysis” submitted by the Department addressing the impact of the Riverside FLUM Amendment on recreation and open space, potable water, sanitary sewer transmission, storm sewer capacity, solid waste collection, and traffic. This one-page document, however, performs no analysis and reflects that the conclusions reached were, instead, based on “assumptions.” The recreation/open space concurrency, by the Department’s own admission, was assumed. Sanitary sewer transmission, by the Department’s own admission, was assumed, and the Department admits that the capacity to service 1,658 new residents is “currently not known.” The availability of potable water was not even analyzed. The conclusions reached regarding these elements are not supported by any data.
The ALJ recognizes that the City did not conduct a housing or an industrial needs assessment before adopting the FLUM Amendment, but contends that these assessments were not needed because the Riverside property “is located within the City’s urban infill area.” This finding ignores the fact that the City considers all of the City as an infill area. The historical evidence of the City’s attempt to bypass performing a needs assessment by simply declaring the entire City an infill area is worth mentioning.
In 1998, in recognition of the importance of the Miami River Corridor and the need for an official coordinating clearinghouse for all public policy and projects related to and affecting the Miami River, the Florida Legislature created the Miami River Commission. The Legislature specifically authorized and directed the Miami River Commission to consolidate existing plans and projects into a coordinated strategy plan for the improvement of the Miami River and the surrounding areas. The following year, the Legislature enacted the Growth Policy Act, including sections 163.2511 through 163.2526, Florida Statutes, authorizing local governments to designate urban infill and redevelopment areas and adopt plans to revitalize these areas. In 2000, the Legislature enacted the Miami River Improvement Act authorizing the City, Miami-Dade County (“the County”), and the Miami River Commission to develop and adopt an urban infill and redevelopment plan for the Miami River.
In recognition of the vital economic, environmental, and geophysical resources of the Miami River Corridor and under the authority of the Miami River Improvement Act, the City and the County entered into a Memorandum of Agreement for the Miami River Corridor for the purpose of designating an urban infill and redevelopment area for the entire Miami River, and they appointed the Miami River Commission to prepare the plan and to insure broad community input and participation. It was the *287 intent of the City and the County that upon adoption by the Miami River Commission of an urban infill plan, both local governments would amend their future land use maps in their comprehensive plans accordingly and implement the plan.
The planning process began with the data collection phase, where information from the City, the County, and the field was gathered regarding all properties within one block of the Miami River, and a comprehensive photographic database was established. The next phase involved a publicly noticed “brainstorming” session, attended by representatives of the marine industry, neighborhood groups, local government, the environment, the real estate community, the development community, and others. At this session the participants identified the opportunities and constraints that needed to be addressed in forming a comprehensive plan for the Miami River Corridor. During the third phase, numerous public workshops were held. In discussing the future of the Miami River, it became clear that issues of incompatible zoning, lack of parking, protection of the working River and the threat of major transportation projects to the quality of life along the Miami River were major concerns.
Ultimately three overarching visions for the Miami River Corridor developed and were presented for discussion. The plan that evolved was built upon earlier plans for the Miami River, including the Miami River Greenway Action Plan, Miami River Master Plan, Miami River Study Commission Report, the Miami River Commission’s Water Quality Improvement Action Plan (approved by both the City and the County), and the consensus reached by the public after discussing and debating the various visions for the Miami River. On September 9, 2002, the Miami River Commission adopted the Miami River Corridor Infill Plan (“Infill Plan”) created to address the long-term future land use and strategic plan for the Miami River.
The County immediately adopted the Infill Plan and amended its Comprehensive Plan to implement it. Inexplicably, the City, after agreeing that a comprehensive plan for urban infill and redevelopment for the entire Miami River Corridor was needed, and after paying for and participating in the creation of the Infill Plan, failed to adopt the Plan, and instead, by ordinance, declared the entire City an urban infill site. Thus, by not adopting the Infill Plan and declaring the entire City as an urban infill site and doing so by ordinance, the City is able to bypass obtaining State approval and State oversight for all small scale amendments to its Future Land Use Map, and also avoid doing a needs assessment before approving small scale FLUM Amendments.
CONCLUSION
While we recognize that agency action enjoys great deference, findings of fact must be supported by competent, substantial evidence. Furthermore, when the agency incorrectly interprets the law or fails to apply the law, the decision rendered is subject to reversal. We conclude that the ALJ erred in: precluding the appellants from introducing evidence and in making argument regarding the FLUM Amendment’s inconsistency with the Port of Miami subelement of the Comprehensive Plan; failing to consider the Port of Miami River subelement of the Comprehensive Plan and critical areas of the Coastal Management and Future Land Use sections of the Comprehensive Plan; failing to consider critical sections of the River Master Plan; and making findings that were unsupported by the evidence. We find that had the ALJ considered these areas of the Comprehensive Plan and the *288 River Master Plan, he could not have concluded that Riverside’s FLUM Amendment was consistent with either. We therefore reverse.
We further note that these “small scale” amendments, when viewed together as a whole, are changing the character of the Miami River waterfront without proper long range planning or input from appropriate agencies, departments, and citizen groups. Because the Miami River is such an important asset to the City, County, and State, such piecemeal, haphazard changes are not only ill-advised, they are contrary to the goals and objectives of those who worked together, debated, and determined how the Miami River waterfront should be developed. If the City’s vision for the Miami River has changed, then that change should be clearly reflected in its Comprehensive Plan to provide industries and land owners along the Miami River with fair notice.
Reversed.
Before RAMIREZ, C.J., and GERSTEN, WELLS, SHEPHERD, SUAREZ, CORTIÑAS, ROTHENBERG, LAGOA and SALTER, JJ.

. Ordinance Number 12761.

. The first reading was on July 28, 2005, and the ordinance was ultimately passed by the City on January 26, 2006. Because the FLUM Amendment was sought as a small scale development pursuant to section 163.3187, Fla. Stat. (2005), the City approved the Amendment under the 2005 version of the statute, and the ALJ applied the 2005 version of the statute in performing his analysis, we will confine our review to the 2005 statutory provisions.

. Merrill Stevens is a long-standing marine business on the Miami River. Dr. Bohnsack testified that Merrill Stevens recently completed a large expansion of its operation, it is doing quite well, and it is going to be able to service larger yachts.

. Brisas was recently granted a FLUM Amendment. This Court has also reversed that decision. See Durham Park Neighborhood Ass'n v. City of Miami, 32 Fla. L. Weekly D2538,-So.3d-(Fla. 3d DCA Oct. 24, 2007).

. The River Master Plan was adopted in 1992. Thus, the data is reflective of available water-dependent land at that time.

. See City Resolution 0030 requesting the Miami River Commission to make recommendations on any item that impacts the Miami River.