927 So.2d 904 (2005)
Herbert PAYNE, et al., Appellants,
v.
CITY OF MIAMI, etc., et al., Appellees.
No. 3D05-708.
District Court of Appeal of Florida, Third District.
November 16, 2005.
Rehearing and Rehearing Denied May 10, 2006.
*905 Andrew W.J. Dickman, for appellants.
Greenberg Traurig (Tallahassee) and David C. Ashburn; Greenberg Traurig (Miami) and Elliot H. Scherker, Paul R. Lipton, Edward G. Guedes, Lucia Dougherty, and Pamela A. DeBooth; Rafael E. Suarez-Rivas, Assistant City Attorney, for appellees.
Before RAMIREZ, SUAREZ, and CORTIAS, JJ.
Rehearing and Rehearing En Banc Denied May 10, 2006.
CORTIAS, Judge.
Balbino Investments, LLC ("Balbino") owns property on the Miami River and seeks to develop Hurricane Cove, a mixed-use retail and residential condominium project. In order to develop Hurricane Cove, Balbino applied for and obtained from the City of Miami ("City") a rezoning of its property and a major use special permit ("MUSP").
The Miami River Marine Group, Inc. ("Marine Group") is an advocacy organization that represents the interests of its members who own and operate marine industry businesses on the Miami River. Marine Group primarily focuses on studying and protecting the marine industry on the Miami River, and promotes land use and growth management policies to protect and enhance marine commerce on the Miami River. Marine Group alleges that the development of Hurricane Cove will increase residential housing on the Miami River, "an area that heretofore has been set aside, zoned, and used for only water-related and water-dependent marine industrial uses." Marine Group also alleges that the increase in residential housing will make it more difficult for its members to operate industrial businesses on the Miami River because "1) it will deplete the limited availability of land dedicated for marine industrial use, and 2) it will cause further real estate speculation and drive up land costs for limited locations on the Miami River resulting in greater likelihood that more industrial land on the river will be converted to residential/commercial use."
Herbert Payne ("Payne") is a member of Marine Group and a boat captain who owns and operates P & L Towing, Inc., one of the largest tugboat companies on the Miami River. Payne claims that he relies exclusively on commercial marine business on the Miami River for his livelihood. Like Marine Group, Payne expresses concern about the increase in residential housing that will result from the development of Hurricane Cove. Payne alleges that this increase in residential housing will make it more difficult for him to operate his business because it "will further erode limited marine industrial zoned land on the Miami River reserved for water-dependent and water-related uses."
Marine Group and Payne (collectively "Appellants"), along with two other plaintiffs,[1] *906 filed a complaint against Balbino and the City (collectively "Appellees"), seeking declaratory and injunctive relief. Appellants maintain that the rezoning and issuance of a MUSP are inconsistent with the City's Comprehensive Neighborhood Plan ("Comprehensive Plan"). Appellees filed a motion to dismiss the complaint for lack of standing. The trial court granted the motion to dismiss as to appellants. However, the trial court denied the motion to dismiss as to the two other plaintiffs, finding that they had standing to proceed.[2]
We review the trial court's dismissal of the appellants' complaint for lack of standing de novo. See Hospice of Palm Beach County, Inc. v. State, Agency for Health Care Admin., 876 So.2d 4, 7 (Fla. 1st DCA 2004); Fox v. Prof'l Wrecker Operators of Fla., Inc., 801 So.2d 175, 178 (Fla. 5th DCA 2001). In determining whether to dismiss a complaint for lack of standing, we must confine our review to the four corners of the complaint, draw all inferences in favor of the pleader, and accept all well-pled allegations in the complaint as true. See Fox, 801 So.2d at 178; see also Wexler v. Lepore, 878 So.2d 1276, 1280 (Fla. 4th DCA 2004); Hospice, 876 So.2d at 7; Putnam County Envtl. Council, Inc. v. Bd. Of County Comm'rs of Putnam County, 757 So.2d 590, 594 (Fla. 5th DCA 2000).
Section 163.3215, Florida Statutes (2004), sets forth the standing requirements for enforcing a local comprehensive plan, and provides, in relevant part:
Any aggrieved or adversely affected party may maintain a de novo action for declaratory, injunctive, or other relief against any local government to challenge any decision of such local government granting or denying an application for, or to prevent such local government from taking any action on, a development order, as defined in s. 163.3164, which materially alters the use or density or intensity of use on a particular piece of property which is not consistent with the comprehensive plan adopted under this part. The de novo action must be filed no later than 30 days following rendition of a development order or other written decision, or when all local administrative appeals, if any, are exhausted, whichever occurs later.
ß 163.3215(3), Fla. Stat. (2004). This statute defines an "aggrieved or adversely affected party" as:
[A]ny person or local government that will suffer an adverse effect to an interest protected or furthered by the local government comprehensive plan, including interests related to health and safety, police and fire protection service systems, densities or intensities of development, transportation facilities, health care facilities, equipment or services, and environmental or natural resources. The alleged adverse interest may be shared in common with other members of the community at large but must exceed in degree the general interest in community good shared by all persons. The term includes the owner, developer, or applicant for a development order.
ß 163.3215(2), Fla. Stat. (2004) (emphasis added).
Prior to the adoption of section 163.3215, common law rules for standing applied, requiring that the party possess a legally recognized right that would be adversely affected by a land use decision. Putnam *907 County, 757 So.2d at 593 (citing Citizens Growth Mgmt. Coal. of West Palm Beach, Inc. v. City of West Palm Beach, 450 So.2d 204, 208 (Fla.1984)). However, after section 163.3215 was adopted, the standing requirements for enforcing a comprehensive plan were liberalized. Putnam County, 757 So.2d at 593; Educ. Dev. Ctr., Inc. v. Palm Beach County, 751 So.2d 621, 623 (Fla. 4th DCA 1999); Southwest Ranches Homeowners Ass'n, Inc. v. County of Broward, 502 So.2d 931, 935 (Fla. 4th DCA 1987). As a remedial statute, section 163.3215 "allows an adversely affected third party to maintain an action to determine whether a development order is consistent with the [local] comprehensive plan." Educ. Dev. Ctr., 751 So.2d at 622-623.
Within the Comprehensive Plan is a section entitled "Ports, Aviation and Related Facilities," which includes a subsection entitled "Port of Miami River." Appellants allege that the City's decision to rezone Balbino's property and to issue a MUSP is inconsistent with the goals, objective, and policies of the "Port of Miami River" subsection. This subsection provides, in relevant part:
Goal PA-3: The Port of Miami River, a group of privately owned and operated commercial shipping companies located at specific sites along the Miami River, shall be encouraged to continue operation as a valued and economically viable component of the city's maritime industrial base.

Objective PA-3.1: The City of Miami, through its Land development regulations, shall help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, and shall regulate its expansion and redevelopment in coordination with the City's applicable coastal management and conservation plans and policies.
Policy PA-3.1.1: The City shall use its land development regulations to encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River, and to discourage encroachment by incompatible uses.
Policy PA-3.1.2: The City shall, through its land development regulations, encourage the development and expansion of the Port of Miami River consistent with the coastal management and conservation elements of the City's Comprehensive Plan.
Policy PA-3.1.3: The City shall, through its land development regulations, encourage development of compatible land uses in the vicinity of the Port of Miami River so as to mitigate potential adverse impacts arising from the Port of Miami River upon adjacent natural resources and land uses.
. . .
Policy PA-3.3.1: The City of Miami, through its Intergovernmental Coordination Policies, shall support the functions of the Port of Miami River consistent with future goals and objectives of the Comprehensive Plan, particularly with respect to the unique characteristics of the Port of Miami River's location and its economic position and functioning within the local maritime industry, and the necessity for coordination of these characteristics and needs with maritime industry that complements, and often competes with, the Port of Miami River.
Appellees contend that appellants do not have standing because they fail to allege an interest protected by the "Port of Miami River" element of the Comprehensive Plan. Specifically, appellees rely on a *908 footnote reference to the subsection titled "Port of Miami River." The footnote states as follows:
The "Port of Miami River" is simply a legal name used to identify some 14 independent privately-owned small shipping companies located along the Miami River, and is not a "Port Facility" within the usual meaning of the term. The identification of these shipping concerns as the "Port of Miami River" was made in 1986 for the sole purpose of satisfying a U.S. Coast Guard regulation governing bilge pump outs.
Appellees argue on appeal that this footnote defines the term "Port of Miami River" and, thus, limits the subsection's application to "some 14 independent privately-owned small shipping companies located along the Miami River." In support of its position, appellees rely on a case which involved property on the Miami River, where the Department of Community Affairs held that the "Port of Miami River" element "applies only to shipping companies as defined in the Comprehensive Plan." Ellen Monkus, James Veber and Gonzalo de Ramon v. City of Miami, DOAH Case No. 04-1080GM (Department of Community Affairs, Final Order, Oct. 28, 2004).
Appellants contend that the footnote merely explains that the Port of Miami River "is not a `Port Facility' within the usual meaning of the term." Appellants correctly point out that the very language of the "Port of Miami River" subsection is not limited to specific companies but to development regulations concerning the Miami River. For example, Policy PA-3.1.1 addresses the City's use of development regulations "to encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River, and to discourage encroachment by incompatible uses." A plain reading of this policy suggests that the subsection was intended to apply to the "uses along the banks of the Miami River" and not to 14 specific companies.
Moreover, appellants contend that the footnote cannot be definitional as there is no record evidence of any list defining the 14 companies. As such, there is no record of the identity of the 14 shipping companies. We do not know who they are or where they are located. Even in Abbott and Costello's "Who's on First," one could eventually determine that Who was on First. Here, after reading and re-reading the footnote along with the "Port of Miami River" element, we are left with the same unanswered question: Who are the 14 companies?
We find that the "Port of Miami River" subsection is not limited to 14 unidentified companies. Rather, the footnote explains that the "Port of Miami River" is not a port in the traditional sense of the word. Accordingly, appellants did not have to allege that they were one of the 14 shipping companies referenced in the footnote.[3]
Appellees also rely on Florida Rock Properties v. Keyser, 709 So.2d 175 (Fla. 5th DCA 1998), where the plaintiff lacked standing to challenge the county's decision to rezone land from agricultural to mining use without requiring a 25 percent set-aside to preserve native vegetation, as required by the county's comprehensive plan. The plaintiff alleged that (1) he owned land approximately ten miles away from the rezoned land, (2) he operated a law business in the county and occasionally represented conservationists, (3) he maintained *909 a life-long interest in environmental protection, and (4) his quality of life would be affected by the county's failure to leave a 25 percent set-aside to protect native vegetation. Id. at 176.
The court held that the plaintiff failed to demonstrate any specific injury to confer standing upon him because mere property and business ownership is insufficient to show that the plaintiff would suffer an adverse effect to an interest protected or furthered by the comprehensive plan. Id. at 177.
Unlike the situation in Florida Rock Properties, in the instant case, appellants' allegations, taken as a whole, are sufficient to confer standing upon them to seek enforcement of the Comprehensive Plan. See, e.g., Putnam County, 757 So.2d at 593. Both appellants allege that they are aggrieved and adversely affected parties with legal standing to bring this action and that they will suffer adverse effects, exceeding the general interests shared by the community at large, as a result of the City's approval of the Hurricane Cove development. They allege that their interests "are protected and furthered by the existing development standards and [C]omprehensive [P]lan to protect available land along the Miami River for water-related and water-dependent marine industrial uses, and quality of life within the City of Miami." They further allege that the development of Hurricane Cove introduces incompatible land uses within the vicinity of marine industrial uses, and allows for land uses that are inconsistent with, or do not further, the Comprehensive Plan.
Appellants also allege that they would suffer specific injuries as a result of the development of Hurricane Cove, such as the negative impact that the development would have on "neighborhood quality, character, safety, densities and intensities of development, buffering, and preserving the Miami River as a `working river.'" Marine Group specifically alleges that the increased residential housing would make it more difficult for its members to conduct business along the river because of (1) the depletion of available land sites for marine industrial uses on the Miami River, and (2) the likelihood that more industrial land on the Miami River will be converted to residential and commercial use. Payne specifically alleges that he will have more difficulty operating marine industrial business along the Miami River because the increase in residential housing is incompatible with marine industrial use and will further erode the limited areas zoned for marine industrial use.
Appellants have alleged an adverse interest that "exceed[s] in degree the general interest in community good shared by all persons." See ß 163.3215(2), Fla. Stat. (2004). Taking all of appellants' allegations as true, as we must on a motion to dismiss for lack of standing, we find that they have sufficiently alleged facts to meet the liberalized standing requirements of section 163.3215. Accordingly, we reverse the trial court's dismissal of appellants' complaint and remand for further proceedings consistent with our holding.
Reversed and remanded.
RAMIREZ, J., concurs.
SUAREZ, J. (dissenting).
I respectfully dissent. The allegations contained in the amended complaint determine the issue of standing. This Court must accept all the material allegations as true, and construe them in favor of the challenged party. Odham v. Foremost Dairies, Inc., 128 So.2d 586 (Fla.1961); Putnam Co. Envtl. Council, Inc. v. Bd. of County Comm'rs, 757 So.2d 590, 594 (Fla. 5th DCA 2000). Therefore, the only issue *910 presently before this Court is whether the allegations contained in Herbert Payne's ("Payne") and the Miami River Marine Group's ("Marine Group") amended complaint, on their face, satisfy the requirements of ß 163.3215, Fla. Stat. (2004). Only if these allegations satisfy the statutory requirements do Payne and the Marine Group have standing to challenge the City's rezoning and issuance of a MUSP on the grounds that these acts are inconsistent with the Miami Comprehensive Neighborhood Plan ("Comprehensive Plan"). Payne and the Marine Group both claim standing under section 163.3215. However, the amended complaint fails to adequately allege, pursuant to the requirements of section 163.3215, that Payne and the Marine Group are "aggrieved" parties whose interests are specifically "protected or furthered" by the Comprehensive Plan, and that they will suffer a harm greater than the general public if Hurricane Cove's construction proceeds. In my opinion, the trial judge was correct in dismissing Payne and the Marine Group from the suit for lack of standing.
To establish standing in an action not involving a constitutional question, a party must show that the interest it seeks to protect falls within a statutory guarantee. Peregood v. Cosmides, 663 So.2d 665, 668 (Fla. 5th DCA 1995) (citing Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). To have standing under section 163.3215 to challenge rezoning on the grounds that it is inconsistent with a comprehensive plan, a party must be one that is "aggrieved," that is, one whose interest is specifically protected or furthered by the comprehensive plan in question. Furthermore, the alleged violation of the party's interest must cause harm greater than that suffered by the community as a whole. Southwest Ranches Homeowners Ass'n, Inc. v. County of Broward, 502 So.2d 931, 935 (Fla. 4th DCA 1987).
Looking first at section 163.3215, it is important to note that, as the Majority states, the statute was designed to liberalize the standing requirement. Even though it has been liberalized, the statute still requires a party to allege certain facts in order for that party to have standing.
163.3215 Standing to enforce local comprehensive plans through development orders.Äî
(1) Subsections (3) and (4) provide the exclusive methods for an aggrieved or adversely affected party to appeal and challenge the consistency of a development order with a comprehensive plan adopted under this part. . . .
(2) As used in this section, the term "aggrieved or adversely affected party" means any person or local government that will suffer an adverse effect to an interest protected or furthered by the local government comprehensive plan.... The alleged adverse interest may be shared in common with other members of the community at large but must exceed in degree the general interest in community good shared by all persons. . . .
ß 163.3215, Fla. Stat. (2005) (emphasis added).
Therefore, in this case, in order meet the statutory requirement of an "aggrieved or adversely affected party," Payne and the Marine Group must allege that they are parties whose personal and professional interests are specifically "protected or furthered" by the Comprehensive Plan, and who stand to suffer greater harm than the community as a whole.
The meaning of the Comprehensive Plan must be gleaned from its plain language. If the intent of the drafters is clear from the language, it is the court's duty to give *911 effect to that intent. Englewood Water Dist. v. Tate, 334 So.2d 626 (Fla. 2d DCA 1976). Furthermore, when the language is clear and unambiguous, it must be given its plain and obvious meaning. Holly v. Auld, 450 So.2d 217, 219 (Fla.1984). The intent of the drafters of the "Port of Miami River" element of Miami's Comprehensive Plan is clear. The drafters of the "Port of Miami River" element chose to narrowly define the entities whose interests the plan was designed to protect and further.[4] The Comprehensive Plan was drafted to specifically protect and further only the interest of the "Port of Miami River," which the plan defines as "fourteen privately owned and operated commercial shipping companies located at specific sites along the Miami River." As such, the only meaning this Court can give the Comprehensive Plan's Port of Miami River element is that it furthers and protects only the interest of those fourteen privately owned and operated companies which comprise the "Port of Miami River."

PORT OF MIAMI RIVER
Goal PA-3: The Port of Miami River, a group of privately owned and operated commercial shipping companies located at specific sites along the Miami River, shall be encouraged to continue operation as a valued and economically viable component of the city's maritime industrial base.
Objective PA-3.1: The City of Miami, through its Land development regulations, shall help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, and shall regulate its expansion and redevelopment in coordination with the City's applicable coastal management and conservation plans and policies.
Policy PA-3.1.1: The City shall use its land development regulations to encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River, and to discourage encroachment by incompatible uses.
Policy PA-3.1.2: The City shall, through its land development regulations, encourage the development and expansion of the Port of Miami River consistent with the coastal management and conservation elements of the City's Comprehensive Plan.
Policy PA-3.1.3: The City shall, through its land development regulations, encourage development of compatible land uses in the vicinity of the Port of Miami River so as to mitigate potential adverse impacts arising from the Port of Miami River upon adjacent natural resources and land uses.
Objective PA-3.2: The City of Miami shall coordinate the surface transportation access to the Port of Miami River with the traffic and mass transit system shown on the traffic circulation map series.
Policy PA-3.2.1: The City of Miami shall, through the Transportation Element of the Comprehensive Plan, coordinate intermodal surface and water transportation access serving the Port of Miami River.
Objective PA-3.3: The City of Miami shall coordinate its Port of Miami River planning activities with those of ports facilities providers and regulators *912 including the U.S. Corps of Engineers, U.S. Coast Guard, and Miami-Dade County's Port of Miami.
Policy PA-3.3.1: The City of Miami, through its Intergovernmental Coordination Policies, shall support the functions of the Port of Miami River consistent with the future goals and objectives of the Comprehensive Plan, particularly with respect to the unique characteristics of the Port of Miami River's location and its economic position and functioning within the local maritime industry, and the necessity for coordination of these characteristics and needs with the maritime industry that complements, and often competes with, the Port of Miami River.
Therefore, pursuant to the plain unambiguous language of the Comprehensive Plan, only the fourteen entities that comprise the Port of Miami River can be "aggrieved" parties who will suffer an adverse effect to an interest protected or furthered by the Comprehensive Plan's Port of Miami River element.
In order to sufficiently allege standing, then, Payne and the Marine Group must allege they are one of the fourteen privately owned companies that comprise the "Port of Miami River" as defined by the Comprehensive Plan. I agree with the Majority that we must confine our review to the four corners of the complaint. Within the four corners of the amended complaint, neither Payne nor the Marine Group makes any such allegation. Therefore, the amended complaint is facially insufficient under section 163.3215 and neither Payne nor the Marine Group has standing to challenge the City's rezoning as being inconsistent with the Comprehensive Plan.
The Majority additionally argues that, because the Comprehensive Plan does not list the fourteen privately owned companies which comprise the Port of Miami River, neither Payne nor the Marine Group has to allege that it is one of the fourteen entities in order to have standing. With all respect, that flies in the face of the requirements of section 163.3215 and the plain language of the Comprehensive Plan. Additionally, this analysis departs from the only issue before this court, that is, whether the amended complaint is facially sufficient under section 163.3215. It could be argued that such analysis confers standing on any Miami-Dade citizen to challenge the City's rezoning on the Miami River as inconsistent with the Port of Miami River element of the Comprehensive Plan. Such, obviously, was not the intent of the legislature in drafting section 163.3215 or of the drafters of the Comprehensive Plan.
The appellants have also failed to sufficiently allege how they would suffer specific harm, different from the community in general, if the Hurricane Cove project is built. See, e.g., Southwest Ranches, 502 So.2d at 931 (holding that association of homeowners adjacent to proposed landfill stood to be directly affected by pollution, flooding, and contamination of water supply, and had standing to challenge the landfill under the county comprehensive plan). The appellants generally allege that Hurricane Cove and projects like it will decrease the amount of riverfront land available for marine industrial use, to the appellant's ultimate economic detriment. This generalized and speculative harm is no different from or greater harm than any other Miami-Dade County citizen could claim. Compare Fla. Rock Props. v. Keyser, 709 So.2d 175, 177 (Fla. 5th DCA 1998) (owner of land and law office ten miles from the parcel that was rezoned from agricultural to mining lacked standing to appeal the zoning decision because he failed to allege that the rezoning would have a specific impact on him or his property); *913 with Putnam County Envtl. Council, 757 So.2d at 590 (environmental non profit corporation that facilitated creation of a state forest standing to challenge construction of a middle school adjacent to the park where the corporation alleged specific injuries, not just to amorphous environmental concerns, including destruction of habitat of species being studied by its members and elimination of members' access to the forest).
The appellants have failed to sufficiently allege that they have standing under the Comprehensive Plan's Port of Miami River element. Therefore, the trial court did not err by dismissing the appellants from this suit.
NOTES
[1] The other two plaintiffs are adjacent landowners.
[2] The other two plaintiffs were found to have standing because they are adjacent landowners.
[3] Even if appellants made such an allegation, it is entirely unclear how this allegation could be proved or disproved.
[4] In almost every case discussed in the briefs concerning standing to enforce a comprehensive plan, the comprehensive plan in questionÄîunlike the Miami Comprehensive PlanÄîdid not state specifically the entities or individuals whose interests were being protected and furthered.