# Third District Court of Appeal

## State of Florida

Opinion filed October 10, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D17-2649
Lower Tribunal No. 17-17478
_____

## Bruce C. Matheson,
Appellant,

vs.

## Miami-Dade County, Florida, etc., et al.,
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Rodolfo A. Ruiz, Judge.

Carlton Fields Jorden Burt, P.A., Richard J. Ovelmen, Enrique D. Arana, Alix I. Cohen, Todd M. Fuller and Scott E. Byers, for appellant.

Abigail Price-Williams, Miami-Dade County Attorney, and Oren Rosenthal, Monica Rizo Perez and Debra Herman, Assistant County Attorneys; Akerman LLP, Gerald B. Cope, Jr., Joseph L. Rebak and Erika R. Shuminer, for appellees.

Before LAGOA, FERNANDEZ and LUCK, JJ.

LUCK, J.

David Beckham and his partners want to build a Major League Soccer stadium in Miami. They bought some land from Miami-Dade County to make it happen. A nearby landowner challenged the sale claiming that the county had a clear legal duty to sell the property by competitive bidding, instead of outright to Beckham and his partners, so the landowner would have the opportunity to buy it. Must the county sell the land through the competitive bid process? No, because the land was sold as an economic development incentive to attract tourism and hospitality industries; attract and retain a soccer business enterprise; create a soccer stadium and new jobs with it; enhance and expand economic activity in the county; grow and create business enterprises in the county; and create construction and development jobs to build the stadium. Because the nearby landowner had no clear legal right to buy the land through the competitive bid process, and the county had no clear legal duty to offer the land for competitive bid, we affirm the trial court's dismissal of the landowner's claim.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On June 6, 2017, the county adopted Resolution No. 567-17 authorizing the sale of approximately 2.79 acres of county land to 0101 Miami Properties, LLC (a company controlled by Beckham and his partners) to be used for the construction and operation of a soccer stadium for a Major League Soccer team. Miami Properties already owned the land next door, but needed the 2.79 acres to put

2

together a lot large enough for the soccer stadium. Miami Properties was to pay the county $9,015,000 for the land. The resolution, the commission said, was adopted pursuant to section 125.045, Florida Statutes,[1] in order to "promote economic development, to strengthen the County's vibrancy, and to attract tourism and attendant hospitality industries by housing a Major League Soccer stadium." The resolution provided that, as part of the deal for the land, Miami Properties was required to "make certain economic investments in Miami-Dade County at the Property," including:

i)  the construction and operation of a sports stadium;
ii) the expenditure of a minimum total of $175,000,000.00 to purchase the land and to construct the facilities necessary for the Stadium Project;
iii) the creation and maintenance of 50 jobs within five years from the date of conveyance, with the majority being full time jobs with a salary of the greater of $27,069.00 or the living wage then in effect; and
iv) the development of a permanent skilled jobs' training program that would train interested applicants in the labor and work necessary for the Stadium Project.

The next month, Bruce Matheson – a neighboring property owner – filed a petition for writ of mandamus and declaratory and injunctive relief. Matheson's petition alleged that section 125.35, Florida Statutes,[2] required the county to offer

---

[1] Section 125.045 is entitled, "County economic development powers," and specifically authorizes the county to "expend public funds for economic development activities," including "leasing or conveying real property." § 125.045(3), Fla. Stat. (2017). "Economic development incentives include . . . [b]elow-market rate leases or deeds for real property." Id. § 125.045(5)(a)4.

[2] Section 125.35 is entitled, "County authorized to sell real and personal property

3

the 2.79 acres for competitive bid, and the county violated its clear legal duty by not doing so.

The county moved to dismiss the petition because Matheson did not have standing to challenge the sale to Miami Properties, and the sale was authorized by section 125.045, which did not require a competitive bid, and therefore, the county did not violate a clear legal duty. Miami Properties intervened in the case, and moved to dismiss on similar grounds. After a lengthy hearing, the trial court granted the motion and dismissed the petition because: (1) Matheson did not have standing to challenge the sale; and (2) even if he did, the county had no clear legal duty to competitively bid the 2.79 acres because section 125.045 allowed the county to sell the property for economic development purposes without complying with the competitive bidding requirements of section 125.35.

## STANDARD OF REVIEW

"The de novo standard of review is applied when considering an order granting a motion to dismiss," Lopez-Infante v. Union Cent. Life Ins. Co., 809 So. 2d 13, 15 (Fla. 3d DCA 2002), and "questions involving statutory interpretation," E.A.R. v. State, 4 So. 3d 614, 629 (Fla. 2009). "A trial court's decision as to

---

and to lease real property." It "authorize[s]" the county "to sell and convey any real or personal property, and to lease real property, belonging to the county . . . to the highest and best bidder for the particular use the board deems to be the highest and best." § 125.35(1)(a), Fla. Stat. (2017).

4

whether a party has satisfied the standing requirement is [also] reviewed de novo." Sosa v. Safeway Premium Fin. Co., 73 So. 3d 91, 116 (Fla. 2011).

## DISCUSSION

Matheson attacks both of the trial court's rulings. He contends that he had standing to challenge the sale of the 2.79 acres to Miami Properties, and the county had a clear legal duty under section 125.35 to competitively bid the property, where Matheson and others would have had an opportunity to buy it at a higher price.

Standing

We first address standing because it "is a threshold inquiry which must be made at the outset of the case before addressing [the merits]." Ferreiro v. Phila. Indem. Ins. Co., 928 So.2d 374, 376 (Fla. 3d DCA 2006) (citations omitted). "A plaintiff must demonstrate the existence of an actual controversy between the plaintiff and the defendant in which plaintiff has a sufficient stake or cognizable interest which would be affected by the outcome of the litigation in order to satisfy the requirements of standing." Warren Tech., Inc. v. Carrier Corp., 937 So. 2d 1141, 1142 (Fla. 3d DCA 2006) (citations omitted).

Matheson alleged that he was "ready, willing and able to purchase the County Property at the same price and on the same terms the County" offered to Miami Properties. This allegation, as it was in Accela, Inc. v. Sarasota County,

5

901 So. 2d 237 (Fla. 2d DCA 2005), is sufficient for standing purposes. In that case, as here, the plaintiffs "asserted that the County had improperly awarded contracts to CSDC Systems for computer software and maintenance services without first obtaining competitive bids or proposals." Id. at 238. The plaintiffs "alleged that the Sarasota County Procurement Code," like Matheson alleges of section 125.35, "require[d] such competitive bidding." Id. "The plaintiffs complained that they stood ready, willing, and able to submit a competitive bid or proposal had the County invited such bids or proposals." Id. The trial court ruled that "Plaintiffs just don't have standing." Id. The Second District Court of Appeal held that "the plaintiffs had standing to complain because they were potential competitors who had a right to seek a determination of whether competitive bidding was required." Id. (citations omitted).

Matheson, too, has alleged that he was a potential competitor for the 2.79 acres sold to Miami Properties, and had a right to seek a determination whether competitive bidding was required. This allegation gives Matheson a sufficient stake or cognizable interest to satisfy the requirements for standing.

The county contends that Matheson's allegation of being "ready, willing, and able" to purchase the property is hollow because any bid would require that a soccer stadium be built for a potential Major League Soccer franchise, and Matheson did not have enough land (even with the 2.79 acres) to build such a

6

stadium. At this stage in the litigation, where we're reviewing the trial court's order granting the motion to dismiss based on Matheson's lack of standing, "we must confine our review to the four corners of the complaint, draw all inferences in favor of the pleader, and accept all well-pled allegations in the complaint as true." Payne v. City of Miami, 927 So. 2d 904, 906 (Fla. 3d DCA 2005) (citations omitted). Accepting Matheson's allegation as true, as we must at this point, he has met the threshold for standing.[3]

### Clear Legal Duty

Matheson challenged the sale because, he alleged, the county violated its clear legal duty by failing to sell the 2.79 acres through the competitive bidding process. Matheson is entitled to a writ of mandamus if he can show: (1) a clear legal right to competitively bid on the 2.79 acres; (2) a clear legal duty by the county to offer the property for competitive bidding; and (3) no other adequate legal remedy available. See Tucker v. Ruvin, 748 So. 2d 376, 377 (Fla. 3d DCA 2000) (describing "the prerequisites for the issuance of a writ of mandamus" as "1) petitioner must have a clear legal right, 2) respondent must have a clear legal,

---

[3] Matheson also alleged standing because he owned property less than a quarter mile away from the 2.79 acres, and would be "substantially and adversely affected by the increased vehicular and pedestrian traffic, congestion, noise, decline in property values, and other impacts the [stadium] project will cause." Because we find Matheson's allegation that he was "ready, willing, and able" to competitively bid on the 2.79 acres was sufficient to challenge the sale, we do not need to decide whether living nearby was also sufficient.

ministerial duty to perform, and 3) petitioner must have no other adequate legal remedy available" (citations omitted)).

Matheson points to section 125.35 as establishing the county's clear legal duty to competitively bid the sale of the property, and specifically, this language:

> (1)(a) The board of county commissioners is expressly authorized to sell and convey any real or personal property, and to lease real property, belonging to the county, whenever the board determines that it is to the best interest of the county to do so, to the highest and best bidder for the particular use the board deems to be the highest and best, for such length of term and such conditions as the governing body may in its discretion determine. . . .

> (c) No sale of any real property shall be made unless notice thereof is published once a week for at least 2 weeks in some newspaper of general circulation published in the county, calling for bids for the purchase of the real estate so advertised to be sold. In the case of a sale, the bid of the highest bidder complying with the terms and conditions set forth in such notice shall be accepted, unless the board of county commissioners rejects all bids because they are too low. The board of county commissioners may require a deposit to be made or a surety bond to be given, in such form or in such amount as the board determines, with each bid submitted.

§ 125.35(1)(a), (c), Fla. Stat. (2017) (emphasis added).

There are two ways to read the underlined language:

- *Matheson's way*. Matheson reads "any real property" to mean all land sold by the county. If the county sells land, even for economic development, it must be done by competitive bid after notice and advertisement.

- *The county's way*. The county reads "any real property" to refer to the real property that the county authorizes for sale by competitive bid under section

8

125.35(1)(a). If the county authorizes property for sale to the highest and best bidder, then any such real property must follow the procedures in subsection (1)(c), including that the sale be advertised in a local newspaper.

In a comprehensive nineteen-page order, the trial court used the tools for reading statutes to conclude that "section 125.045 of the Florida Statutes contains independent authority for the County to convey the Stadium Property to the Stadium Developer as an economic development project, and said conveyance is not subject to the competitive provisions of section 125.35." We adopt the trial court's reasoning that the county had no clear legal duty to offer the 2.79 acres for competitive bid, and only add to explain why.

> The Florida Supreme Court has told us how we should read section 125.35.
>
> [I]f a part of a statute appears to have a clear meaning if considered alone but when given that meaning is inconsistent with other parts of the same statute or others in pari materia, the Court will examine the entire act and those in pari materia in order to ascertain the overall legislative intent.

Fla. State Racing Comm'n v. McLaughlin, 102 So. 2d 574, 575-76 (Fla. 1958), quoted in E.A.R., 4 So. 3d at 629, and Fla. Dep't of Envtl. Prot. v. ContractPoint Fla. Parks, LLC, 986 So.2d 1260, 1265-66 (Fla. 2008). "The doctrine of in pari materia is a principle of statutory construction that requires that statutes relating to the same subject or object be construed together to harmonize the statutes and to give effect to the Legislature's intent." Fla. Dep't of State, Div. of Elections v.

9

Martin, 916 So. 2d 763, 768 (Fla. 2005) (citations omitted). "Where possible, courts must give full effect to all statutory provisions and construe related statutory provisions in harmony with one another." Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So. 2d 452, 455 (Fla. 1992); see also Howarth v. City of De Land, 158 So. 294, 298 (Fla. 1934) ("The courts, in construing a statute, must, if possible, avoid such construction as will place a particular statute in conflict with other apparently effective statutes covering the same general field."). Moreover, "[i]t is axiomatic that all parts of a statute must be read together in order to achieve a consistent whole." Forsythe, 604 So. 2d at 455.

Or, as Justice Scalia and Bryan Garner have explained,

> Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts. Sir Edward Coke explained the canon in 1628: "[I]t is the most natural and genuine exposition of a statute to construe one part of the statute by another part of the same statute, for that best expresseth the meaning of the makers."

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) (alteration in original). And:

> **The provisions of a text should be interpreted in a way that renders them compatible, not contradictory**. . . . The imperative of harmony among provisions is more categorical than most other canons of construction because it is invariably true that intelligent drafters do not contradict themselves (in the absence of duress). Hence there can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously.

10

Id. at 180.

Matheson's reading of section 125.35 is not in harmony with the other, related sections of chapter 125. Chapter 125, entitled "County Government," "codifies the County's broad home rule powers." Miami-Dade Cty. ex rel. Walthour v. Malibu Lodging Investments, LLC, 64 So. 3d 716, 718 (Fla. 3d DCA 2011). The county, among other powers, has the "authority to employ personnel, expend funds, enter into contractual obligations," and, most importantly here, "purchase or lease and sell or exchange real or personal property." § 125.01(3)(a), Fla. Stat. (2017). Chapter 125 then sets out a number of ways that a county can go about selling its land. For example:

*Section 125.045, "County economic development powers"*

(3) For the purposes of this section, it constitutes a public purpose to expend public funds for economic development activities, including, but not limited to, developing or improving local infrastructure, issuing bonds to finance or refinance the cost of capital projects for industrial or manufacturing plants, leasing or conveying real property, and making grants to private enterprises for the expansion of businesses existing in the community or the attraction of new businesses to the community. . . .

(5)(a) By January 15, 2011, and annually thereafter, each county shall report to the Office of Economic and Demographic Research the economic development incentives in excess of $25,000 given to any business during the county's previous fiscal year. The Office of Economic and Demographic Research shall compile the information from the counties into a report and provide the report to the President of the Senate, the Speaker of the House of Representatives, and the Department of Economic Opportunity. Economic development incentives include:

11

1. Direct financial incentives of monetary assistance provided to a business from the county or through an organization authorized by the county. Such incentives include, but are not limited to, grants, loans, equity investments, loan insurance and guarantees, and training subsidies.

2. Indirect incentives in the form of grants and loans provided to businesses and community organizations that provide support to businesses or promote business investment or development.

3. Fee-based or tax-based incentives, including, but not limited to, credits, refunds, exemptions, and property tax abatement or assessment reductions.

4. <u>Below-market rate leases or deeds for real property</u>.

<u>Id.</u> § 125.045(3), (5)(a) (emphasis added).

*Section 125.38, "Sale of county property to United States, or state"*

<u>If</u> the United States, or any department or agency thereof, the state or any political subdivision or agency thereof, or <u>any</u> municipality of this state, or <u>corporation or other organization not for profit which may be organized for the purposes of promoting community interest and welfare, should desire any real or personal property that may be owned by any county of this state or by its board of county commissioners, for public or community interest and welfare</u>, <u>then</u> the United States, or <u>any</u> department or agency thereof, state or such political subdivision, agency, municipality, <u>corporation or organization may apply to the board of county commissioners for a conveyance or lease of such property. Such board, if satisfied that such property is required for such use and is not needed for county purposes, may thereupon convey or lease the same at private sale to the applicant for such price, whether nominal or otherwise, as such board may fix, regardless of the actual value of such property</u>. The fact of such application being made, the purpose for which such property is to be used, and the price or rent therefor shall be set out in a resolution duly adopted by such board. In case of a lease, the term of

such lease shall be recited in such resolution. <u>No advertisement shall be required</u>.

<u>Id.</u> § 125.38 (emphasis added).

Matheson's reading of section 125.35 conflicts with sections 125.045 and 125.38. Matheson contends that all real property that the county sells must be by competitive bid to the "highest and best bidder." The highest and best bid is the one "financially most advantageous to the community." <u>Marriott Corp. v. Metro. Dade Cty.</u>, 383 So. 2d 662, 665 (Fla. 3d DCA 1980). But section 125.045 allows the county to sell its real property at a "[b]elow-market rate" as an "[e]conomic development incentive." Requiring that all county property be put out for bid and sold at the "financially most advantageous" price conflicts with the county's power to sell its property at a below-market rate for economic development purposes. By definition, selling property at a below-market rate, as allowed by section 125.045, cannot be the financially most advantageous price for the county, which is required by section 125.35.

Section 125.38 also allows the county to sell land to a nonprofit for a nominal or less-than-actual-value price, and the sale does not need to be advertised. This, too, is inconsistent with Matheson's reading of section 125.35 that all county land must be sold through the competitive bidding process to the highest and best bidder. The nominal price offered to the nonprofit will never be

the highest and best bid, and section 125.38 specifically allows a county to disregard the "actual value" of the property being sold.

The state attorney general rejected Matheson's reading of section 125.35 more than forty years ago. In 1974, Seminole County wanted to lease some of its recently-acquired property to a nonprofit little league baseball association. Op. Att'y Gen. Fla. 74-219 (1974). The county asked the attorney general for a legal opinion on the following question: "Would such a lease, if proper, be controlled by the procedural requirements of [section] 125.35 [the competitive bidding statute] or of [section] 125.38 [the statute authorizing nominal sales to nonprofits]?" Id. The attorney general answered:

> You inform me that Seminole County has recently acquired, by eminent domain, a 30-acre parcel of real property for use as part of a large park. The county now proposes to lease a portion of this 30-acre tract for a ten-year term to a nonprofit corporation for use in connection with little league baseball activities. . . .
>
> Sections 125.35 and 125.38, [Florida Statutes], relate to the sale and leasing of county-owned property. . . . [I]t is clear that section 125.38 is applicable to the proposed lease you describe. [Section] 125.35 covers county leases in general; [section] 125.38 is much more specific, amounting, in effect, to an exception to the general statute. Since the lease falls within the terms of the specific statute, that one – and not the general statute – applies.

Id. While attorney general opinions are not binding, they are persuasive, Hardee Cty. v. FINR II, Inc., 221 So. 3d 1162, 1166 (Fla. 2017) ("Attorney General opinions are also persuasive in statutory construction."), and we are persuaded by

14

this one, especially because we must read related statutes in harmony where possible.

Chapter 125 authorizes a number of ways for a county to sell its property. Normally, a county will sell its land through the competitive bidding process in section 125.35. But there are exceptions for a county to sell real property at a below-market rate for economic development, section 125.045, and at a nominal rate to community interest nonprofits that will use the land for the public interest and welfare, section 125.38. Reading section 125.045 as an exception to the competitive bidding requirements of section 125.35, as the attorney general did for section 125.38, avoids an unnecessary conflict and harmonizes the various provisions of chapter 125.[4]

Matheson's reading of section 125.35 is also flawed because it makes the common "interpretive fault" of failing to "consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Scalia & Garner, supra, at 167. Matheson reads the first sentence in subsection (1)(c) –

---

[4] Matheson relies heavily on Pandya v. Israel, 761 So. 2d 454 (Fla. 4th DCA 2000), but we don't find that case helpful because Pandya did not discuss the conflict between sections 125.35 and 125.045, and the issue in that case was whether the county could sell property it did not own. (It couldn't, the court said.) Id. at 458 ("We agree with Judge Kroll that section 125.35 contemplates that the County will sell real property in the traditional way – when it owns the property. . . . Our reading of section 125.35 is that the County may 'sell and convey' only real property that it owns."). Pandya did not address how we read section 125.35 in relation to other specific authorizations to sell land in chapter 125, and it did not address the economic development incentive statute in section 125.045.

"[n]o sale of any real property shall be made unless notice thereof is published once a week for at least 2 weeks in some newspaper of general circulation published in the county, calling for bids for the purchase of the real estate so advertised to be sold," § 125.35(1)(c), Fla. Stat. (2017) – to mean that all county property that is sold must be done by competitive bid. But this reading is inconsistent with the text, structure, and title of section 125.35.

The first sentence of section 125.35 "expressly authorize[s]" the county "to sell and convey any real or personal property, and to lease real property, belonging to the county, whenever the board determines that it is to the best interest of the county to do so, to the highest and best bidder . . . ." Id. § 125.35(1)(a). "Authorize" means "[t]o formally approve; to sanction." Authorize, Black's Law Dictionary (9th ed. 2009). Reading section 125.35 as Matheson does would mean the legislature approved the sale of county property by competitive bidding in subsection (1)(a), but then mandated that competitive bidding be used for all land sales in subsection (1)(c). Reading section 125.35 Matheson's way would make the express authorization in subsection (1)(a) superfluous because the mandate in (1)(c) would cover all sales of real property. There would be no need for an express authorization if there's already a mandate to do the same thing in subsection (1)(c). We don't read statutes that way. See Metro. Cas. Ins. Co. v. Tepper, 2 So. 3d 209, 215 (Fla. 2009) ("[W]ords in a statute are not to be construed

16

as superfluous if a reasonable construction exists that gives effect to all words.") (quotation omitted).

The structure of section 125.35 also weighs against Matheson's reading. Subsection (1)(a) authorizes a county to sell its land through the competitive bidding process. Subsection (1)(b) carves out some narrow exceptions for sales that do not have to be competitively bid. And subsection (1)(c) sets out the process a county must use to competitively bid its real property: the sale must be published at least once a week for two weeks in a newspaper of general circulation; the publication must call for bids to purchase the advertised real estate; and the highest bid must be accepted (unless they are all too low). The reference in subsection (1)(c) to "sale of any real property" refers to the real property a county has authorized for sale by competitive bid. The subject of the procedural requirements of subsection (1)(c) is the real property authorized for sale in subsection (1)(a).

The title to section 125.35 also sheds light on whether the statute mandates collective bidding for all real property sold by a county or merely authorizes competitive bidding as one method for selling property. See Aramark Unif. & Career Apparel, Inc. v. Easton, 894 So. 2d 20, 25 (Fla. 2004) ("We have previously stated that in determining legislative intent, we must give due weight and effect to the title of the section. The title is more than an index to what the section is about or has reference to; it is a direct statement by the legislature of its intent.") (citation

17

and quotation omitted).  Section 125.35 is entitled, "County authorized to sell real and personal property and to lease real property."  The title indicates that section 125.35 is an authorization, and not a mandate, to sell property through the competitive bidding process.

A decade ago, in ContractPoint, the Florida Supreme Court rejected a reading of a statute similar to Matheson's reading of section 125.35.  There, a state contractor sued the department of environmental protection for breach of contract, and obtained a judgment for $628,543.  Id. at 1262.  The department refused to pay "based on its assertion that section 11.066 prohibits a state agency from paying any judgment unless there is a specific appropriation by the Legislature for that judgment."  Id.  Subsection (3) of section 11.066 provided that "[n]either the state nor any of its agencies shall pay or be required to pay monetary damages under the judgment of any court except pursuant to an appropriation made by law."  Id. at 1265 (quoting section 11.066).  "While subsection (3), standing alone, appears to be an absolute bar to the State's payment of all judgments," the Court conceded, "[i]n interpreting section 11.066 . . . we cannot read subsection (3) in isolation, but must read it within the context of the entire section . . . ."  Id. at 1265-66.  That meant reading subsection (3) "with reference to subsection (2)," which provided:

> The state and each state agency, when exercising its inherent police power to protect the public health, safety, or welfare, is presumed to be acting to prevent a public harm. A person may rebut this presumption in a suit

18

> seeking monetary damages from the state or a state
> agency only by clear and convincing evidence to the
> contrary.

§ 11.066(2), Fla. Stat. (2005) (emphases supplied).

> This express reference to suits "seeking monetary damages" made in
> the context of the State's exercise of its "police power to protect the
> public health, safety, or welfare" precedes the references in subsection
> (3) to "monetary damages under the judgment of any court" and "a
> judgment for monetary damages." The reference to police power also
> precedes the remaining subsections that discuss execution on State
> property and application of mandamus to enforce such judgments.
> Subsection (2) clearly focuses the thrust of the statute on judgments
> arising from claims based on the exercise of the State's police power
> and says nothing about claims arising from breach of contract. The
> references in subsection (3) to "monetary damages" echo the
> provisions of subsection (2) and accordingly relate to monetary
> damages contained in judgments arising from the exercise of the
> State's police powers. Therefore, the statute does not express a clear
> intent to bar payment of valid breach of contract judgments, but rather
> expresses an intent to limit payment of judgments arising out of the
> exercise of the State's police powers.

Id. at 1266. The Court read "monetary damages" in subsection (3) in context with

the rest of the statute to find that it referred to the state's exercise of its police

powers.

We must give section 125.35(1)(c)'s reference to the "sale of any real

property" the same reading. Section 125.35(1)(a) expressly authorizes the county

to sell real property to the highest and best bidder. Subsection (1)(c) lays out the

procedure for how a county conducts and notices the competitive bid. The "sale of

any real property" mentioned in subsection (1)(c) refers to the real property that

19

has been authorized for sale by competitive bid in subsection (1)(a) – not all real property that is ever sold by the county pursuant to other provisions of chapter 125.

Matheson contends we are bound by <u>Rolling Oaks Homeowner's Association v. Dade County</u>, 492 So. 2d 686 (Fla. 3d DCA 1986) to hold that the sale of county land for a stadium must be done by the competitive bidding process in section 125.35. In <u>Rolling Oaks</u>, years earlier, a local family had donated land to the county. <u>Id.</u> at 687. The county leased the donated property "for the purpose of constructing a large sports stadium and attendant commercial facilities." <u>Id.</u> Nearby homeowners sued, in part, because the county "acted illegally in authorizing a lease that was not necessarily made to the highest and best bidder pursuant to section 125.35, Florida Statutes." <u>Id.</u> at 689.

First, <u>Rolling Oaks</u> could not address the issue in this case – whether the county's sale of property as an economic development incentive pursuant to section 125.045 must be done by competitive bidding pursuant to section 125.35 – because that statute was added by the legislature to the county's powers in 1995, Ch. 95-309, § 1, at 2773, Laws of Fla., almost a decade after <u>Rolling Oaks</u> was decided.[5] The economic development incentives statute didn't exist when the court considered <u>Rolling Oaks</u>, and the county did not sell the property as an economic

---

[5] Subsection (5)(a), authorizing the county to deed real property at "[b]elow-market rate[s]" as an "economic development incentive," was added in 2010. Ch. 10-147, § 1, Laws of Fla.

development incentive, as it did here. We couldn't hold anything as to whether land sold as an economic development incentive had to be competitively bid under section 125.35 because that issue wasn't before the court.

Even if it was, Rolling Oaks supports the county's reading of section 125.35. In response to the homeowners' claim that the county failed to comply with section 125.35, the stadium company argued that the "transaction [was] exempt from bidding under section 125.39, Florida Statutes, which excludes conveyances for a specific purpose which contain a reversionary clause." Id. We explained that under the exclusion in section 125.39, "[a]s long as a conveyance to the county includes a valid special purpose and reverter clause [the elements needed for the section 125.39 exclusion], the competitive bidding requirements do not apply to county dispositions." Id. at 690. We found, however, that at least one of the parcels leased by the county did "not qualify for this exemption." Id. at 689.

Rolling Oaks acknowledges, as we do here, that section 125.35 competitive bidding is subject to specific exemptions in chapter 125, as long as the statutory requirements of those exemptions are met. (Rolling Oaks is also consistent with the attorney general's 1974 opinion – section 125.35 is subject to limited and specific exceptions and exclusions.) The legislature added section 125.045 as an additional exclusion for below-market land conveyances done for the purpose of economic development. Like the exclusion in Rolling Oaks, as long as the

21

requirements of section 125.045 are met, a county can deed real property at a below-market rate outside the competitive bidding process.

Matheson also contends that the county's reading of section 125.35 gives it too much power to avoid competitive bidding. All the county would have do is characterize the sale as an "economic development incentive," and it can sell the property directly to one party at a below-market rate without having to solicit competitive bids. This is a recipe for abuse and corruption, Matheson says. As he explains in his initial brief, "[t]he entire point of the competitive bidding statute is to protect the public from collusive, corrupt, sweetheart, and backroom deals made with the local government's favored constituents."

We have sanctioned no such thing. Competitive bidding under section 125.35 is, and remains, the normal process for selling county land. But the legislature authorized other ways for a county to sell its real property, including for economic development activities under section 125.045, or to a community interest nonprofit for the public interest under section 125.38. Under the economic development incentive exception, the county cannot sell to favored constituents for a corrupt or collusive purpose. That would be illegal. See, e.g., § 838.016(1), Fla. Stat. (2017) ("It is unlawful for any person to knowingly and intentionally give, offer, or promise to any public servant, or, if a public servant, to knowingly and intentionally request, solicit, accept, or agree to accept, any pecuniary or other

22

benefit not authorized by law, for the past, present, or future performance, nonperformance, or violation of any act or omission which the person believes to have been, or the public servant represents as having been, either within the official discretion of the public servant, in violation of a public duty, or in performance of a public duty.").

And even if it wasn't illegal, section 125.045 would not permit it because the statute only authorizes a county to sell real property for the public purpose of economic development activities. Section 125.045 describes such activities as "facilitat[ing] the growth and creation of business enterprises in the counties of the state"; "attact[ing] and retain[ing] business enterprises"; and "the expansion of businesses existing in the community or the attraction of new businesses to the community." Id. § 125.045(1)-(3). If the sale doesn't meet this criteria for economic development activity, then the county cannot use section 125.045 to sell the property and must competitively bid the property or find another exception under chapter 125.

Here, the attachments to Matheson's complaint showed that the sale of the 2.79 acres to Miami Properties was for economic development activities. The sale required Miami Properties to: (a) construct and operate a sports stadium; (b) spend a minimum of $175,000,000 to purchase the land and construct the facilities necessary for the stadium project; (c) create and maintain no less than fifty

permanent jobs at the stadium within five years, with a majority of the jobs being full time and having an annual salary greater than the county living wage; (d) comply with the county's small business enterprise programs during construction; (e) hold at least two job fairs to recruit local employees; and (f) develop a permanent skilled jobs training program.

## CONCLUSION

Because the 2.79 acres were sold to Miami Properties as an economic development incentive, the county did not have to comply with the competitive bidding requirements of section 125.35. Thus, Matheson did not have a clear legal right to buy the property, and the county did not have a clear legal duty to sell it by competitive bid. The trial court correctly dismissed Matheson's complaint, and we affirm the dismissal.

Affirmed.